**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAWRENCE J. WARFIELD,
          *Plaintiff-Appellee,*

          v.

MICHAEL ALANIZ,
                    *Defendant,*

          and

LEONARD BESTGEN; BETTY BESTGEN;
ROBERT CARROLL; CHARLES DAVIS;
PATRICK WEHRLY; ANDREA
WEHRLY,
          *Defendants-Appellants.*

No. 07-15586

D.C. No.
CV-03-02390-JAT

LAWRENCE J. WARFIELD,
          *Plaintiff-Appellant,*

          v.

MICHAEL ALANIZ,
                    *Defendant,*

          and

LEONARD BESTGEN; BETTY BESTGEN;
ROBERT CARROLL; RUDY
CROSSWELL; MARY CROSSWELL;
CHARLES DAVIS; PAUL RICHARD
PATRICK WEHRLY; ANDREA
WEHRLY,
          *Defendants-Appellees.*

No. 07-16377

D.C. No.
CV-03-02390-JAT

OPINION

Appeals from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

7645

Argued and Submitted
October 23, 2008—San Francisco, California

Filed June 24, 2009

Before: J. Clifford Wallace, Sidney R. Thomas and
Susan P. Graber, Circuit Judges.

Opinion by Judge Thomas

**COUNSEL**

Burton M. Bentley, The Bentley Law Firm, P.C., Phoenix, Arizona, for the defendants-appellants/appellees.

Alisan M.B. Patten, Guttilla Murphy Anderson, P.C., Phoenix, Arizona, for the plaintiff-appellee/appellant.

**OPINION**

THOMAS, Circuit Judge:

This appeal presents the question, *inter alia*, of whether the charitable gift annuities sold in this case were investment contracts under federal securities law. We conclude they were, and we affirm the judgment of the district court.

I

Not only did Robert Dillie promise his investors "a gift for your lifetime and beyond," he pledged "preservation of the American way of life," "preservation of your assets," and "preservation of the American family." Unless Dillie meant to refer to the way of life perfected by the Boston swindler Charles Ponzi and his family,[1] we can safely say that Dillie's claims were a bit overstated.

---

[1] *See United States v. Masten*, 170 F.3d 790, 797 n.9 (7th Cir. 1999) (describing the origin of the Ponzi scheme).

The vehicle by which Dillie was to deliver these dreams was a charitable gift annuity, sold through the Dillie-controlled Mid-America Foundation ("Foundation"). From 1996 until 2001, the Foundation sold its charitable gift annuities through financial planners, insurance agents, and others, including the Defendants in this lawsuit.

The Foundation's marketing literature assured investors that they would receive a lifetime stream of income, with the money remaining at their death directed to a charity designated by the investor. The promotion was initially an enormous success for Dillie; the return for the investors was not. In all, the Foundation raised $55 million dollars from the sale of more than 400 charitable gift annuities. Unfortunately, the business model was simply a Ponzi scheme[2] in which, rather than investing the investors' funds, the Foundation used the investors' funds to make annuity payments to earlier annuitants, commission payments to facilitators, and payments to Dillie and others for personal expenses (including Dillie's gambling expenses). Although it collected millions in investments, the Foundation quickly became insolvent. With a few minor exceptions, no charitable contributions were ever made, and the scheme collapsed in 2001.

Shortly after the collapse, the Securities and Exchange Commission filed a civil complaint against Dillie. The district court appointed Lawrence Warfield ("Receiver") as Receiver for Receivership Assets in order to "prevent waste and dissipation of the assets of the Defendants to the detriment of investors." Dillie was subsequently indicted and ultimately pled guilty to several counts of wire fraud and money laundering. He was sentenced to 121 months in prison.

---

[2]Generically, a Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *Alexander v. Compton (In re Bonham),* 229 F.3d 750, 759 n.1 (9th Cir. 2000).

The Receiver filed the instant complaint seeking the return of commissions paid to agents by the Foundation for the sale of the charitable gift annuities. The Receiver alleged breach of fiduciary duty, constructive fraud in confidential relationship, negligence and gross negligence, common law fraud, federal and state security fraud, actual and constructive fraudulent transfer, conversion, and unjust enrichment.

The district court denied the Receiver's motion for summary judgment on the fraudulent transfer claim and denied Defendants' motion for summary judgment on all but the common law fraud claim. *Warfield v. Alaniz*, 453 F. Supp. 2d 1118 (D. Ariz. 2006). It also denied Defendants' request to dismiss the non-resident Defendants for lack of personal jurisdiction, finding that it had personal jurisdiction over them under 15 U.S.C. § 78aa, which confers nationwide service of process in suits to enforce liabilities or duties created under the Securities Exchange Act of 1934. *Id.* at 1128-29.

After a seven-day jury trial, the jury found for the Receiver on the federal and state securities law, constructive fraud, negligence per se, and unjust enrichment claims and for Defendants on the general negligence, conversion, and fraudulent transfer claims. Defendants were ordered to pay damages ranging from $31,900 to $109,900 per person. Defendants timely appealed the judgment, and the Receiver filed a protective cross-appeal from the district court's denial of summary judgment on the fraudulent transfer claim.[3]

We review de novo the district court's denial of a motion for summary judgment, *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005), as well as the district court's determination that the charitable gift annuities were investment contracts,[4]

---

[3]A protective cross-appeal is permissible once an initial appeal is filed, raising the possibility of reversal. *Bryant v. Technical Research Co.*, 654 F.2d 1337, 1341-42 (9th Cir. 1981).

[4]Here, the parties contest the legal significance of undisputed facts. When a mixed question of fact and law involves undisputed underlying facts, summary judgment may be appropriate. *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir. 1994).

*see United States v. Carman*, 577 F.2d 556, 562 (9th Cir. 1978) ("Although characterization of a transaction raises questions of both law and fact, the ultimate issue of whether or not a particular set of facts, as resolved by the factfinder, constitutes an investment contract is a question of law.").

II

The district court correctly held that the Foundation's charitable gift annuities were investment contracts subject to regulation as securities under Section 2(a)(1) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 ("1934 Act") (collectively with the 1933 Act, "Securities Acts"), 15 U.S.C. § 78c(a)(10).[5]

A

**[1]** Our analytical framework is governed by the Supreme Court's guidance in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Under the *Howey* test, "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298-99. In *Howey*, the Supreme Court found an "investment contract" present where promoters sold acreage with fruit trees on it as well as "service contracts" to cultivate and market the crops, with an allocation of the net profits going to the purchaser. The *Howey* Court noted that its definition of investment contract "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable

---

[5]As to the state causes of action, Arizona's statutory definition of "security" at Arizona Rev. Stat. section 44-1801(26) mirrors the federal definition, and Arizona courts "look to federal courts for guidance in interpreting the statute." *See Nutek Info. Sys., Inc. v. Ariz. Corp. Comm'n.*, 977 P.2d 826, 830 (Ariz. Ct. App. 1998).

schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299.

We distilled *Howey*'s definition into a three-part test requiring "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) (internal quotation marks omitted). The third prong of this test, requiring "an expectation of profits produced by the efforts of others," involves two distinct concepts: whether a transaction involves any expectation of profit and whether expected profits are the product of the efforts of a person other than the investor.[6]

In applying the *Howey* test, we are mindful of the remedial purpose of the Securities Acts, as well as the Supreme Court's repeated rejection of a narrow and literal reading of the definition of securities. *See, e.g., Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990) (noting that, "[i]n defining the scope of the market that it wished to regulate [via the federal securities laws], Congress painted with a broad brush."); *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("[I]n searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality."); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943) ("Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a 'security.' ").

---

[6]Indeed, at least two of our sister circuits and one authoritative securities law treatise have identified *Howey*'s test as a four-part test. *See, e.g., Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*, 198 F.3d 685, 700 (8th Cir. 1999); *Allen v. Lloyd's of London*, 94 F.3d 923, 930 (4th Cir. 1996); 1 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 1.6[2][A]-[D] (5th ed. 2005).

Applying these principles to the case at hand, we note that it is undisputed that, as the district court explained:

> [T]he investors paid money to Mid-America through an irrevocable gift of cash, securities, or other assets. In return, Mid-America promised to pool the money in investments such as stocks, bonds, and money market funds, and to periodically pay each of the investors a fixed sum of money based on their individual ages and the date that payment commenced. In addition to a monthly income stream, the investors expected to receive substantial tax benefits resulting from their purchase of the CGAs.

*Warfield*, 453 F. Supp. 2d at 1123-24. It is also undisputed that the Foundation's literature promised that monies remaining after the named annuitants' lifetime would be directed to a charity designated by those who purchased the charitable gift annuities.

Defendants argue that the investors did not make any "investment of money" within the meaning of *Howey* because they lacked the requisite intent to realize financial gain through the transactions, and intended instead to make charitable donations. In addition, and relatedly, Defendants argue that the investors had no "expectation of profits" because the anticipated value of the gift annuities at the time of purchase was always less than the purchase amount. Defendants do not dispute that there was a "common enterprise" or that any profits were "the product of the efforts of a person other than the investor," and we accordingly need not address whether the Foundation's charitable gift annuities satisfy these elements of the *Howey* test.

### B

**[2]** The "investment of money" prong of the *Howey* test "requires that the investor 'commit his assets to the enterprise

in such a manner as to subject himself to financial loss.' " *Rubera*, 350 F.3d at 1090 (quoting *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976)(per curiam)). In *Rubera*, we found this prong satisfied where investors "turned over substantial amounts of money . . . with the hope that [the investment managers' efforts] would yield financial gains." *Id.* It is undisputed in this case that the purchasers of the Foundation's gift annuities "turned over substantial amounts of money" in exchange for the Foundation's promise to make annuity payments and turn funds remaining at the end of the annuitant's life over to designated charities. Furthermore, although the Foundation falsely represented that investors' accounts were "secured by the multi-million dollar assets of the Mid-America Foundation," the investors risked financial loss due to the (now realized) possibility that the Foundation would not be able to honor its promises. Defendants argue, however, that the purchasers of the Foundation's gift annuities made no investment of money because they lacked the intent to realize a financial gain and were motivated solely to make a charitable donation. We reject this argument.

[3] At the outset, we note that, while the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts, we must focus our inquiry on what the purchasers were offered or promised. Under *Howey,* courts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were "led to expect." 328 U.S. at 298-99; *see also Joiner*, 320 U.S. at 352-53 ("The test [for determining whether an instrument is a security] . . . is what character the instrument is given in commerce *by the terms of the offer*, the plan of distribution, and the economic inducements held out to the prospect." (emphasis added)). Accordingly, courts have frequently examined the promotional materials associated with an instrument or transaction in determining whether an investment contract is present. *See, e.g.*, *SEC v. Edwards*, 540 U.S. 389, 392 (2004) (observing that the payphone sale and buyback scheme involved investment contracts where

promotional materials noted "potential for ongoing revenue generation"); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 854 (1975) (noting, in the course of finding investment contract test not met, that the promotional materials "[n]owhere . . . seek to attract investors by the prospect of profits" and rather "repeatedly emphasize[ ] the 'nonprofit' nature of the endeavor"); *see also Rice v. Branigar Org.*, 922 F.2d 788, 791 (11th Cir. 1991) (holding investment contract definition was not met where promotional materials for housing development did not emphasize investment value of lots); *SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 464-65 (9th Cir. 1985) (relying in part on brochure's representations of profit possibility in finding ore purchase reinvestment program satisfied *Howey* test); *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1039-40 (10th Cir. 1980) (stating that in determining whether real estate transaction constitutes security, "promotional emphasis of the developer" is "[c]entral"); *United States v. Carman*, 577 F.2d 556, 564 (9th Cir. 1978) (holding an investment contract was present where business "consistently promoted the package it offered as an investment").

**[4]** Our review of the record in this case demonstrates that the Foundation marketed its gift annuities as investments, and not merely as vehicles for philanthropy. One promotional brochure entitled "Maximizer Gift Annuity: A Gift that Offers Lifetime Income . . . and Beyond" states, under the heading "Attractive Returns," that "[y]our annuity payment is determined by your age and the amount you deposit. The older you are, the more you'll receive." The brochure goes on to list the "current average net-yield" rates. Elsewhere, under a heading titled "A Gift that Gives to the Donor," the brochure states:

> To get this same return through the stock market, [the hypothetical investor] would have had to find investments that pay dividends of 19.3%! (Even the most profitable companies rarely pay dividends of

more than 5%.) The rate of return on a Mid-America Foundation "Gift Annuity" is hard to beat!

The brochure also includes a chart comparing the benefits of a $200,000 commercial annuity with a $200,000 charitable gift annuity, indicating the superiority of the charitable gift annuity in such categories as annuity rate, annual income, income tax savings, federal estate tax savings, and "partial bypass capital gains." Although the brochure also notes that the investor will "make a difference" through the purchase of the gift annuity, the brochure as a whole emphasizes the income generation and tax savings aspect of the charitable gift annuity. Indeed, a bullet point summary of the advantages of the Foundation's charitable gift annuities states: "High Rates; Tax Free Income; Capital Gains Tax Savings; Current Tax Savings; Estate Tax Free; Safe; Secure; Simple; Flexible; PAYS YOU NOW!!! HELPS YOU MAKE A DIFFERENCE LATER."

**[5]** Another brochure entitled "The Charitable Gift Annuity: Preserving Your Family Legacy . . . Now and For Generations to Come" places emphasis on the opportunity for the investor to designate family members as secondary annuitants under the scheme, noting that "[y]ou can easily include your spouse, children, or grandchildren to receive these lifetime benefits." This brochure also emphasizes the stability and security of charitable gift annuities, noting that "[a] gift annuity is one of the OLDEST and SAFEST financial instruments available." On the whole, this brochure pitches charitable gift annuities to an investor whose main concern is to provide a steady stream of income to dependents after he or she is gone. The brochure's emphasis is on the long-term income production potential of the charitable gift annuity. The fact that some purchasers may have been attracted to the gift annuities in part by the Foundation's promise to donate funds remaining after the annuitants' life to a designated charity does not alter the outcome. *See Forman*, 421 U.S. at 853 n.17 (suggesting that existence of collateral non-investment motive does not

shield transaction from securities laws). In sum, when the promotional materials are examined, the investment component of the annuity is evident.

In addition to considering the Foundation's marketing materials, we note that the gift annuities were marketed and sold to persons who were likely to be attracted by the Foundation's promises of periodic payment of income and tax benefits. *See, e.g., Howey*, 328 U.S. at 300-01 (considering class of persons to whom investment opportunity was offered in reaching determination that investment contract was present). At oral argument, Defendants suggested that the charitable gift annuities were marketed solely to the elderly, who had little interest in a return on their investment. This contention is belied by the record. Not only were there relatively young investors, but some purchasers designated a much younger "second-life annuitant," often a son or daughter, who stood to receive the monthly annuity payments for the duration of his or her life after the death of the primary annuitant. In addition, to impose a requirement that the elderly must expect personally to see returns on an investment before his or her death effectively renders the "investment contract" definition inapplicable to a large portion of the population. As the Supreme Court has noted, the particular motives of investors—and the types of investment vehicles appealing to them—may vary considerably depending on the investor's stage of life. *See Edwards*, 540 U.S. at 394. That the charitable gift annuity purchaser preferred a perceived low-risk investment yielding a stable long-term income for himself and a designated beneficiary rather than a higher risk investment should not bar the investor from the protection of the securities laws.

**[6]** In sum, because under the terms of the Foundation's offer, the purchasers of the Foundation's gift annuities committed their assets in return for promised financial gain, the transactions involved satisfy the "investment of money" prong.

C

Defendants also argue that gift annuity transactions fail to satisfy the "expectation of profits" element of the *Howey* test. The Supreme Court addressed the definition of "profits" under *Howey* in *Forman*, 421 U.S. at 852-60, holding that shares in a non-profit housing development did not constitute securities because purchasers of the shares had no reasonable expectation of profits. In reaching its decision, the Court explained that, "[b]y profits, th[is] Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds." *Id.* at 852.

More recently, the Court explained that, in *Forman*, it had provided an "illustrative description of prior decisions on 'profits,'" not an "exclusive" definition of "profits." *Edwards*, 540 U.S. at 396. In *Edwards*, the Court held that a payphone sale-and-leaseback arrangement involved the offer of investment contracts. The Court held that the *Howey* test was satisfied despite the fact that the scheme promised a fixed rather than variable rate of return, noting that "investments pitched as low-risk (such as those offering a 'guaranteed' fixed return) are particularly attractive to individuals more vulnerable to investment fraud, including older and less sophisticated investors." *Id.* at 394. *Edwards* also noted that, in *Howey*, the Court "used 'profits' in the sense of income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment." *Id.*

[7] After *Edwards*, it is clear that fixed periodic payments of the sort promised in the present case may constitute "profits" for purposes of the *Howey* test. However, the thrust of Defendant's argument is that the "expectation of profits" prong also requires an expectation of *net* financial gain lacking in this case. This position finds support in *Edwards*, which noted that "*Forman* supports the commonsense understanding of 'profits' in the *Howey* test as simply 'financial

returns on . . . investments.' " 540 U.S. at 396 (quoting *Forman*, 421 U.S. at 853). Defendants argue that because the estimated value of the gift annuities at the time of purchase was always less than the initial payment amount, the purchasers expected no net gain from the transaction. Indeed, Defendants argue that it was *impossible* for purchasers to see returns on their investment and that accordingly, any payments to Defendants could not constitute "profits." Defendants' argument fails.

**[8]** Under the terms of the Foundation's charitable gift annuity contracts, the fixed rate at which the annuity amount was to be paid was based on the life expectancy of the purchaser. Of course, the present value of the annuity at the time of purchase, which was also based on the projected life expectancy of the purchaser, was always less than the purchase price. That fact, however, does not establish that it was *impossible* for the purchaser to profit from the charitable gift annuity investment. Indeed, whether or not a particular purchaser stood to see a return on his or her initial investment depended entirely on whether the investor (or the designated secondary beneficiary) lived longer than the actuarial tables predicted. Furthermore, as we discussed in the preceding section, consideration of the Foundation's promotional literature, as well as the annuity contracts themselves, demonstrates that the Foundation presented its gift annuity as opportunity for financial gain. The record indicates that for many of the annuitants, the periodic payments and tax benefits could deliver a return on the initial payment, especially when the payments paid to designated "second-life" annuitants are taken into account. Further, the purchaser may well have anticipated an increase in investment value that would accrue to the benefit of the charity. At heart, Defendants' argument under the "profits" prong closely mirrors their argument that the purchasers of gift annuities made no investment of money and fails for the same reasons discussed in our consideration of that prong.

**[9]** We conclude that the structure of the charitable gift annuity contracts included an expectation of profit within the meaning of *Howey*.

### D

**[10]** In summary, the district court properly determined that the Foundation's charitable gift annuities were, in fact, investment contracts and therefore subject to federal securities law.

### III

We next address Defendants' argument that they are exempt from the broker-dealer registration provisions of the 1934 Act.[7] The 1934 Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 1934 Act § 3(a)(4)(A), 15 U.S.C. § 78c(a)(4)(A). Section 15 of the 1934 Act provides that securities brokers and dealers must be registered unless they deal only intrastate or are otherwise specifically exempted from registration. 1934 Act § 15(a)(1), 15 U.S.C. § 78*o*(a)(1). Specifically, Defendants contend that they qualified for exemptions to the registration requirements under sections 3(a)(12)(A)(v) and 3(e)(1) of the 1934 Act, both of which were added to the 1934 Act by the Philanthropy Protection Act of 1995 ("Philanthropy Act"), Pub. L. No. 104-62, 109 Stat. 682 (codified in scattered sections of 15 U.S.C.). Before

---

[7]The district court judge decided the closely related issue of whether the charitable gift annuities were themselves "exempted securities" under section 3 of the 1934 Act. *See Warfield*, 453 F. Supp. 2d at 1125-26. However, even if the charitable gift annuities *were* exempt from the registration requirements of the Securities Acts under the Philanthropy Act, they would still be subject to the fraud provisions of the Securities Acts. Therefore, we need not decide whether the charitable gift annuities themselves were exempt under the Philanthropy Act. However, because the jury was instructed that one element of the Receiver's constructive fraud claim was satisfied as a matter of law by Defendants' violation of the broker-dealer registration laws, we must address the issue in that context.

addressing Defendants' arguments on this point, we briefly discuss the background of the Philanthropy Act.

A

**[11]** The Philanthropy Act was passed to codify certain long-standing SEC interpretations of existing exemptions from registration under the Securities Acts for charitable organizations. *See* H.R. Rep. 104-333, at 8 (1995), *reprinted in* 1995 U.S.C.C.A.N. 619, 622. Prior to the passage of the Philanthropy Act, the federal securities laws exempted charitable organizations and securities issued by these organizations from securities registration requirements—provided that no part of the net earnings of the organizations inured to the benefit of any person, private shareholder, or individual. *See* Investment Company Act of 1940 ("Investment Company Act") § 3(c)(10), 15 U.S.C. § 80a-3(c)(10) (excluding charitable organizations from the definition of an investment company); 1933 Act § 3(a)(4), 15 U.S.C. § 77c(a)(4) (exempting from provisions of 1933 Act, except for anti-fraud provisions, any security issued by a charitable organization); 1934 Act § 12(g)(2)(D), 15 U.S.C. 78*l*(g)(2)(D) (same with regard to 1934 Act).

The limiting language in all of these provisions left open the possibility that charitable organizations maintaining charitable income funds were ineligible for the exemption because the "donor" to such a fund (or the purchaser of a gift annuity) receives part of the net earnings of the organization in the form of periodic income. However, the SEC specified in a series of releases and no-action letters that it would take no enforcement action against organizations maintaining such funds and issuing such instruments. *See Christ Church of Washington*, SEC No-Action Letter, 1974 WL 9979 (May 17, 1974) (stating that staff would not recommend action to Commission if tax exempt church issues gift annuities without registration); Pooled Income Funds, Release No. 16478, 19 SEC Docket No. 142, 1980 WL 20766 (Jan. 10, 1980) (stating that

staff would not recommend enforcement against public charities maintaining pooled income funds in accordance with specified standards).

Despite these assuring SEC interpretations, Congress was spurred to enact the Philanthropy Act by litigation alleging that charitable organizations issuing charitable gift annuities were operating as unregistered investment companies under federal securities law. *See* H.R. Rep. 104-333, at 4-5. The Philanthropy Act amended the 1933 and 1934 Acts, the Investment Company Act, and the Investment Advisers Act of 1940 by providing specific exemptions for charitable organizations maintaining income funds meeting certain specifications. The upshot of these amendments was to exempt certain funds maintained by charitable organizations, securities issued by these funds, and employees of these funds, from the securities and broker-dealer registration requirements of the Securities Acts. *See generally* Timothy L. Horner & Hugh H. Makens, *Securities Regulation of Fundraising Activities of Religious and Other Non-Profit Organizations*, 27 Stetson L. Rev. 473 (1997).

Central to our analysis is the Philanthropy Act's amendment of section 3(c)(10) of the Investment Company Act to exclude from the definition of an investment company "[a]ny company organized and operated exclusively for religious, educational, benevolent, fraternal, charitable, or reformatory purposes—which is or maintains a fund described in subparagraph (B)." Philanthropy Act § 2(a) (codified at 15 U.S.C. § 80a-3(c)(10)). Subparagraph (B) states in relevant part:

> [A] fund is described in this subparagraph if such fund is a pooled income fund, collective trust fund, collective investment fund, or similar fund maintained by a charitable organization exclusively for the collective investment and reinvestment of one or more of the following . . .

(ii) assets of a pooled income fund;

(iii) assets contributed to a charitable organization in exchange for the issuance of charitable gift annuities. . . .

*Id.*

The two exemptions to which Defendants contend they are entitled refer back to this language; we turn to these exemption provisions next.

B

**[12]** We first address Defendants' argument that they are entitled to the exemption defined at section 4(b) of the Philanthropy Act. Relevant for our purposes is the following language:

(1) Exemption

Notwithstanding any other provision of this title, but subject to paragraph (2) of this subsection, *a charitable organization*, as defined in section 3(c)(10)(D) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(c)(10)(D)], *or any trustee, director, officer, employee, or volunteer of such a charitable organization acting within the scope of such person's employment or duties with such organization*, shall not be deemed to be a "broker", "dealer", "municipal securities broker", "municipal securities dealer", "government securities broker", or "government securities dealer" for purposes of this chapter solely because such organization or person buys, holds, sells, or trades in securities for its own account in its capacity as trustee or administrator of, or otherwise on behalf of or for the account of—

(A) such a charitable organization;

(B) *a fund that is excluded from the definition of an investment company under section 3(c)(10)(B) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(c)(10)(B)]. . . .*

Philanthropy Act § 4(b) (codified at 15 U.S.C. § 78c(e)(1)) (emphasis added).

Defendants argue that this exemption provision applies to them because they were employees of the Foundation, a charitable organization, and sold the charitable gift annuities on behalf of the Foundation.[8] However, this exemption is limited by under another provision of the Philanthropy Act titled "Limitation on Compensation." That provision states:

> The exemption provided under paragraph (1) shall not be available to any charitable organization, or any trustee, director, officer, employee, or volunteer of such a charitable organization, unless each person who . . . solicits donations on behalf of such charitable organization from any donor to a fund that is excluded from the definition of an investment company under section 3(c)(10)(B) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(c)(10)(B)], is either a volunteer or is engaged in the overall fund raising activities of a charitable organization and *receives no commission* or other special compensation based on the number of donations collected for the fund.

---

[8]At oral argument, the Receiver argued that this exemption was inapplicable because the Foundation was not in fact "a charitable organization, as defined in section 80a-3c(10)(D)." We need not reach this argument because it is clear that, even assuming the Foundation was a "charitable organization" under the terms of the statute, both the Foundation and Defendants were ineligible for the exemption.

*Id.* § 4(b) (codified at 15 U.S.C. 78c(e)(2)) (emphasis added).

Defendants argue that this limitation on exemption does not apply to them, because they were independent contractors, and the term "independent contractor" is not specifically mentioned in the provision limiting exemption. However, Defendants' argument undermines their own position—the provision that creates the exemption does not mention "independent contractors," either. Under Defendants' logic, the Philanthropy Act did not limit their ability to receive commissions, but neither did it exempt them from the broker-dealer provisions of the 1934 Act in the first place.

**[13]** Even setting aside Defendants' illogical reading of the statute, the legislative history of the Philanthropy Act makes clear that the limitation on compensation was based on a broad concern about the risk of abusive sales practices:

> The Commission historically has viewed the receipt of transaction-based compensation as potentially providing the incentive to persons who work for charitable organizations to engage in high-pressure or abusive sales practices.

> Accordingly, the staff has conditioned its position that associated persons of charitable organizations are exempt from the broker-dealer provisions of the Exchange Act upon the absence of this type of compensation.

H.R. Rep. No. 104-333, at n.4 (citation omitted).

More recently, an SEC No-Action letter stated that the SEC could not assure that it would not recommend enforcement in circumstances almost identical to those presented in this case. *See* New Life Corporation of America, SEC No-Action Letter, 1999 WL 152895, at 1 (Mar. 16, 1999) (providing no assurance of no action where 501(c)(3) entity wished to pay

commissions to independent financial professionals unregistered as broker-dealers for the sale of gift annuities).

**[14]** In sum, Defendants were not exempt from registration as brokers under 15 U.S.C. § 78c(e)(1). Because Defendants received commissions for their sale of the Foundation's charitable gift annuities, they were ineligible for the exemption under § 78c(e)(2).

### C

Defendants also argue that, because the charitable gift annuities constitute "exempted securities" under 15 U.S.C. § 78c(a)(12)(A)(v), the 1934 Act's broker-dealer registration provisions do not apply to Defendants. The 1934 Act's registration provisions state in relevant part:

> It shall be unlawful for any broker or dealer . . . to induce or attempt to induce the purchase or sale of, any security (*other than an exempted security* or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

1934 Act § 15(a)(1), 15 U.S.C. § 78*o*(a)(1) (emphasis added). The Philanthropy Act amended section 3 of the 1934 Act to expand the definition of "exempted securities" at section 3(a)(12)(A) to include "any security issued by or any interest or participation in any pooled income fund, collective trust fund, collective investment fund, or similar fund that is excluded from the definition of an investment company under section 80a-3(c)(10)(B) of this title." Philanthropy Act § 4(a) (codified at 15 U.S.C. § 78c(a)(12)(A)(v)). Defendants suggest, in effect, that § 78c(a)(12)(A)(v), when read in combination with § 78*o*(a)(1), exempted them from the registration requirements of the 1934 Act, even though, as discussed above, section 4(b) of the Philanthropy Act specifically

amended the 1934 Act to provide that persons selling securities on behalf of a "fund excluded from the definition of an investment company under [§ 80a-3(c)(10)(B)]" are exempt from the 1934 Act's broker-dealer regulations (including registration provisions) *unless* these persons are compensated for their sale of the securities.

The Commission itself has rejected an identical argument, stating that "[w]hile Exchange Act Sections 3(a)(12)(A)(v) and 3(e) may, upon a cursory review, appear to be somewhat at odds, the legislative history of those Sections makes it clear that the language contained in Section 3(e) correctly establishes the relevant exemption." *See* New Life Corporation of America, SEC No-Action Letter, 1999 WL 152895, at 1 (Mar. 16, 1999) (footnote omitted).

**[15]** We agree with the Commission. If Congress's intent in amending the definition of exempted securities at 15 U.S.C. § 78c(a)(12)(A) to include securities issued by certain charitable income funds was to exempt all persons selling these securities from the broker-dealer registration requirement at 15 U.S.C. § 78*o*(a), the express exemption for employees of such funds at § 78c(e)(1) would be redundant. More to the point, the limitation on the exemption at § 78c(e)(2) would be toothless, a result clearly at odds with the Philanthropy Act's purpose, as expressed in the House Report. Finally, the suggestion that the more general registration exemption provision at § 78*o*(a)(1) (read in combination with § 78c(a)(12)(A)(V)) trumps the more specific provisions at §§ 78c(e)(1) and (2) is contrary to established principles of statutory interpretation. *See NLRB v. A-Plus Roofing, Inc.*, 39 F.3d 1410, 1415 (9th Cir. 1994) ("It is a well-settled canon of statutory interpretation that specific provisions prevail over general provisions.").

**[16]** In sum, we hold that Defendants were not exempt,

under the Philanthropy Act, from the 1934 Act's broker-dealer registration provisions.[9]

## IV

**[17]** The district court correctly held that it had personal jurisdiction over the non-resident Defendants. Defendants argue that, because the charitable gift annuities were not securities, the district court lacked personal jurisdiction over the non-resident Defendants Carroll and Davis. This argument is subsumed in our consideration of whether the Foundation's charitable gift annuities were securities as a matter of law. Given our conclusion that they were, personal jurisdiction over Carroll and Davis was proper pursuant to the "nation-wide service of process" provisions in section 27 of the 1934 Act, 15 U.S.C. § 78aa. *See Sec. Investor Prot. Corp. v. Vigman*, 764 F.2d 1309, 1316 (9th Cir. 1985) ("[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."); *SEC v. Ross*, 504 F.3d 1130, 1140 (9th Cir. 2007) (same true with regard to Section 22 of the 1933 Act).

## V

Defendants argue that the district court erred in issuing an *Allen* instruction to the deadlocked jury. After deliberating for almost three days, the jury notified the court on Friday afternoon that it had reached an impasse. The district court then issued the *Allen* instruction, at which point the jurors retired to deliberate for another hour. After resuming deliberation Monday morning, the jury reached a verdict after two hours. The parties disagree as to whether Defendants properly

---

[9]We do not address the district court's ruling that the charitable gift annuities were not exempt from securities regulation under 15 U.S.C. § 77c(a)(8) because Defendants waived the issue by failing to raise it in their opening brief.

objected to the *Allen* instruction at trial and thus whether we should review for plain error or abuse of discretion. We need not resolve this dispute because Defendants' argument fails under either standard of review.

**[18]** In determining whether an *Allen* charge is coercive, we examine: (1) the form of the instruction; (2) the time the jury deliberated after receiving the charge in relation to the total time of deliberation; and (3) any other indicia of coerciveness. *United States v. Daas*, 198 F.3d 1167, 1180 (9th Cir. 1999). Defendants are correct that the deliberation time after the charge was given (three hours) was short in relation to the total deliberation time (more than three days). However, the instructions themselves were of standard form. Furthermore, the "weekend interval itself probably would have diluted any coercive effect" of the *Allen* charge given Friday. *See United States v. Steele*, 298 F.3d 906, 911 (9th Cir. 2002). We find no error in the district court's *Allen* instruction.

## VI

For the above reasons, we affirm the judgment of the district court. The charitable gift annuities sold by Defendants on behalf of the Foundation were investment contracts, and hence securities for purposes of federal and state securities laws. Defendants were not exempt from registration as securities brokers under the terms of the Philanthropy Act. Because the charitable gift annuities were securities, the district court had personal jurisdiction over the non-resident Defendants. Finally, the district court did not err in giving the jury an *Allen* charge. Given our resolution of these questions, we need not reach any other issue urged by the parties, including the matters argued by the Receiver in his protective cross-appeal.

**AFFIRMED**.