# United States Court of Appeals
## For the First Circuit

No. 11-2449

CÉSAR CALDERÓN-SERRA ET AL.,

Plaintiffs, Appellants,

v.

WILMINGTON TRUST CO. ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Lipez, Circuit Judges.

Francis T. Pagán-Martínez, with whom Rafael González Vélez and González Vélez Law Office were on brief, for appellants.
Stephen E. Hudson, with whom Eduardo A. Zayas-Marxuach, McConnell Valdés LLC, and Kilpatrick Townsend & Stockton LLP were on brief, for appellee Wilmington Trust Co.
Sara Lydia Vélez-Santiago, with whom Néstor M. Méndez-Gómez, Margarita Mercado-Echegaray, and Pietrantoni Mendez & Alvarez LLC were on brief, for appellee Banco Popular de Puerto Rico.

April 22, 2013

**SELYA, <u>Circuit Judge</u>.** Most people make investments in the expectation (or at least the hope) of turning a profit. But investments sometimes go sour. That happened here, and the appellants are trying to recoup their losses through a novel interpretation of an exemption in the Trust Indenture Act of 1939 (TIA), 15 U.S.C. §§ 77aaa-77bbbb.[1] Construing the exemption as a matter of first impression, we conclude that the appellants' interpretation fails. Their suit fails with it. Federal courts do not have jurisdiction to redress every perceived wrong, and we agree with the court below that this case falls outside the encincture of federal subject matter jurisdiction.

The appellants, César Calderón-Serra and Teresita Palerm-Nevares, purchased and still own nonrecourse notes (the Notes) in the face amount of approximately two million dollars, issued by the Puerto Rico Conservation Trust Fund (PRCTF). The PRCTF operates as a nonprofit organization, <u>see</u> 26 U.S.C. § 501(c)(3), with the stated purpose of protecting and enhancing Puerto Rico's natural resources.

The proceeds from the sale of the Notes were used by the PRCTF to acquire preferred securities and to pay the costs of issuance of the Notes. The Notes were not registered under the

---

[1] Although this appeal was argued in conjunction with the appeal in <u>Nikitine</u> v. <u>Wilmington Trust Co.</u>, No. 12-1874, we have opted to dispose of the cases by separate opinions.

Securities Act, see 15 U.S.C. § 78*l*, based on an exemption from registration.

After the Notes went into default, the appellants sued the appellees — Banco Popular de Puerto Rico (BPPR), trustee of the Notes, and Wilmington Trust Company (WTC), indenture trustee of the securities that the PRCTF purchased with Note proceeds — alleging that "they were deceived into believing that the [N]otes were backed by the government of Puerto Rico."[2]  They brought their suit in the United States District Court for the District of Puerto Rico on the basis of federal question jurisdiction.  See 28 U.S.C. § 1331.  After amending their complaint once as of right, see Fed. R. Civ. P. 15(a)(1)(B), the appellants premised their assertion of subject matter jurisdiction on both the Edge Act, 12 U.S.C. § 632, and the TIA.[3]

Each appellee moved to dismiss the first amended complaint for want of subject matter jurisdiction.  The appellants opposed these motions.  Some five months after the first amended complaint was filed (while the fully briefed motions to dismiss

_____

[2] A third defendant, UBS Financial Services, Inc., was dropped from the case prior to the filing of the appellants' first amended complaint.

[3] In the jurisdictional section of their first amended complaint, the appellants also refer to the Sarbanes-Oxley Act of 2002, 15 U.S.C. §§ 7201-7202, 7211-7220, 7231-7234, 7241-7246, 7261-7266, 78*o*-6, 78d-3; 18 U.S.C. §§ 1348-1350, 1514A, 1519-1520. In the same pleading, however, they concede "that no right of action under Sarbanes-Oxley exists."  Thus, we do not ponder the Sarbanes-Oxley Act as a source of subject matter jurisdiction.

-3-

were under advisement), the appellants sought leave to file a second amended complaint. The district court denied that motion and summarily rejected a motion for reconsideration. Then, the court, in a thoughtful opinion, granted the motions to dismiss. See Calderón-Serra v. Wilmington Trust Co., No. 10-1905, 2011 WL 5335395, at *1 (D.P.R. Nov. 4, 2011). This timely appeal followed.

We begin with bedrock. "Federal courts, as courts of limited jurisdiction, may not presume the existence of subject matter jurisdiction, but, rather, must appraise their own authority to hear and determine particular cases." Cusumano v. Microsoft Corp., 162 F.3d 708, 712 (1st Cir. 1998). "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995) (internal quotation marks omitted). Where, as here, a district court grants a motion to dismiss for want of subject matter jurisdiction on the pleadings, its order of dismissal engenders de novo review. See Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009). In performing this task, "we take as true all well-pleaded facts in the plaintiffs' complaints, scrutinize them in the light most hospitable to the plaintiffs' theory of liability, and draw all reasonable inferences therefrom in the plaintiffs' favor." Id.

In this venue, the appellants do not pursue their claim that the Edge Act confers federal subject matter jurisdiction.

-4-

This is a wise decision: in order for that statute to supply a basis for federal subject matter jurisdiction, "one party to the action [must] be an entity that owes its existence to the federal sovereign." Viqueira v. First Bank, 140 F.3d 12, 19 (1st Cir. 1998); see 12 U.S.C. § 632. Typically, that would be a nationally chartered bank. Here, however, both defendants are state-chartered banks (WTC is organized under the laws of Delaware and BPPR is organized under the laws of Puerto Rico). Hence, the Edge Act does not afford a basis for subject matter jurisdiction here.

The appellants propose that there is federal subject matter jurisdiction under the TIA. The district court rejected this proposition, see Calderón-Serra, 2011 WL 5335395, at *3, and so do we.

Congress enacted the TIA in 1939 as a means of combating unsavory practices related to the public offering of bonds, notes, and debentures. See 15 U.S.C. § 77bbb(b); see also SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186 (1963). The district courts have jurisdiction over all suits brought to enforce any duty or liability arising under the TIA, subject to an exception not relevant here. See 15 U.S.C. § 77v(a). But the TIA does not have a limitless scope. For example, it does not apply to "any security exempted from the provisions of the Securities Act of

1933," by, among other provisions, paragraphs 2 through 8 of 15 U.S.C. § 77c(a).[4]  Id. § 77ddd(a)(4)(A).

Pertinently, paragraph 4 exempts charitable organizations from the reach of the Securities Act, see id. § 77c(a)(4), and thus from the reach of the TIA.[5]  That provision reads:

> [T]he provisions of this subchapter shall not apply to . . . [a]ny security issued by a person organized and operated exclusively for religious, educational, benevolent, fraternal, charitable, or reformatory purposes and not for pecuniary profit, and no part of the net earnings of which inures to the benefit of any person, private stockholder, or individual . . . .

Id.  This, in effect, comprises a two-part test.

In this case, the Notes were issued by the PRCTF, which the appellants concede is a section 501(c)(3) nonprofit organization.  Consequently, the Notes come within the first part of the charitable organization exemption to the Securities Act.

In an effort to soften the bite of this reasoning, the appellants posit that the Notes have an "individual profit-generating effect" that places them outside the charitable organization exemption.  They insist that as long as note-holders

_____

[4] The appellants contend that section 77c does not apply to the TIA.  Since they have offered no developed argumentation for this counter-intuitive proposition, we deem it waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[5] For ease in exposition, we refer to this exemption as the "charitable organization exemption."  We recognize, however, that organizations other than charities are also shielded by the terms of the provision.

-6-

have a noncharitable purpose in purchasing notes (say, a desire to earn interest), the exemption is inapposite. This construction of the charitable organization exemption is antithetic to the plain meaning of the unambiguous statutory language. We explain briefly.

We think it is obvious that the purpose on which the first part of the exemption hinges is the purpose for which the note-issuing organization exists, not the parochial motivations of particular note-holders. See, e.g., SEC v. Children's Hosp., 214 F. Supp. 883, 888-90 (D. Ariz. 1963). The critical determinant under the first part of the test, then, is whether the issuing organization is structured and operated as a charitable organization and not for pecuniary profit. In this connection, the "pecuniary profit" of which the charitable organization exemption speaks relates to the organization's purpose, not the note-holders' investment returns. See SEC v. Universal Serv. Ass'n, 106 F.2d 232, 237-38 (7th Cir. 1939). The PRCTF unarguably satisfies this eleemosynary requirement.

There is, of course, a second requirement that must be satisfied: if any part of the "net earnings" of the charitable organization "inures to the benefit of any person, private stockholder, or individual," the exemption does not apply. 15 U.S.C. § 77c(a)(4). In our view, it is equally obvious that this "net earnings . . . inures to the benefit" language does not refer to interest payments made by a charitable organization on funds

borrowed in the ordinary course of business from outside investors and intended to allow the organization to fulfill its mission. <u>See</u> <u>Warfield</u> v. <u>Alaniz</u>, 569 F.3d 1015, 1025 (9th Cir. 2009); <u>SEC</u> v. <u>Am.</u> <u>Found. for Advanced Educ. of Ark.</u>, 222 F. Supp. 828, 831 (W.D. La. 1963). Properly construed, this language does not encompass interest payments to outside bond-holders, note-holders, or debenture-holders. <u>Cf.</u> <u>SEC</u> v. <u>World Radio Mission, Inc.</u>, 544 F.2d 535, 537 & n.1 (1st Cir. 1976) (discussing interest-bearing notes issued by nonprofit religious organization).

The appellants' contrary reading turns the charitable organization exemption inside out and, if implemented, would unravel the fabric of the exemption. There is no dispute that the PRCTF disclosed its intention to use the Note capital to purchase preferred stock and to use dividends from the preferred stock to finance the Notes. This investment approach is common practice among charitable organizations. The offering circular does not suggest — let alone support — any basis for the appellants' assertion that a "majority of the proceeds generated by the [PRCTF's securities] transactions" would be directed to "private stockholders." We therefore disregard that assertion as implausible.

Virtually every person who purchases a bond, a note, or a debenture is motivated, at least in part, by the prospect of earning interest; and basing the legal status of a nonprofit

organization upon the motives of those who purchase its securities defies common sense.  We cannot conceive that Congress intended so bizarre a result.

Resisting this conclusion, the appellants hurl an array of doctrines as if they were frisbees.  These initiatives are of no help.  We mention two of them to illustrate this point.

First, the appellants suggest that the Howey test, see SEC v. W.J. Howey Co., 328 U.S. 293, 298-99, 301 (1946), tips the jurisdictional scales in their favor.  But the Howey test is only used to determine whether an instrument is an "investment contract" for purposes of the Securities Act.  See, e.g., SEC v. Edwards, 540 U.S. 389, 393 (2004).  There is no question that the Notes are securities, so the Howey test has no bearing here.  Second, the appellants say that the "step-transaction" doctrine leads to a finding of subject matter jurisdiction. They are wrong.  The step-transaction doctrine is used to assess tax liability, see, e.g., Comm'r of Internal Revenue v. Clark, 489 U.S. 726, 738 (1989); Associated Wholesale Grocers, Inc. v. United States, 927 F.2d 1517, 1521-22 (10th Cir. 1991), and it is of no assistance in this non-tax case.

That ends this aspect of the matter.  We hold that, in the circumstances of this case, the TIA is not a hook on which the appellants may hang federal subject matter jurisdiction.  We also hold that the appellants have failed to show any other cognizable

predicate for such jurisdiction. Their suit simply does not arise under federal law.

These holdings do not complete our journey. As a fallback, the appellants contend that the district court arbitrarily denied them leave to file a second amended complaint. A brief chronology suffices to put this claim of error into perspective.

The appellants filed their action (and thus their initial complaint) on September 20, 2010. They filed their first amended complaint approximately six months later. They did not move for leave to file a second amended complaint until September 6, 2011. The appellees opposed their motion.

It is common ground that leave to amend should be "freely give[n]" in circumstances in which "justice so requires." Fed. R. Civ. P. 15(a)(2). But the largesse that Rule 15(a)(2) contemplates is not without limits. The rule "does not mean . . . that a trial court must mindlessly grant every request for leave to amend." Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 58 (1st Cir. 2006). A district court may deny leave to amend when the request is characterized by "undue delay, bad faith, futility, [or] the absence of due diligence on the movant's part." Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006). So, too, the court may deny the request if the proposed amendment "would serve no useful purpose." Aponte-Torres, 445 F.3d at 58.

We review a district court's refusal to grant leave to amend for abuse of discretion.  See Palmer, 465 F.3d at 30; Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 19 (1st Cir. 2001).  In the course of such review, we "defer to the district court's hands-on judgment so long as the record evinces an adequate reason for the denial."  Aponte-Torres, 445 F.3d at 58.

In this instance, the district court rejected the appellants' motion because of undue delay.  It noted that the appellants previously had amended their complaint.  It then emphasized that the motion for permission to file a second amended complaint was not filed until nearly a year after the commencement of the action and many months after the fully briefed motions to dismiss had been taken under advisement.

We discern no abuse of discretion.  Appreciable delay alone, in the absence of good reason for it, is enough to justify denying a motion for leave to amend.  See, e.g., Kay v. N.H. Dem. Party, 821 F.2d 31, 34 (1st Cir. 1987) (per curiam) (affirming a finding of undue delay when three months had elapsed).

The appellants strive to persuade us that they had good reason for the delay.  To this end, they point to the fact that this case was twice passed from judge to judge and vaguely assert that these reassignments justified their laggardly pace.  We are not convinced.

-11-

The record reflects that, when filed, the case was originally assigned at random to a district judge who immediately recused himself. The case was redrawn that same day to Judge Domínguez. On May 13, 2011, Judge Domínguez withdrew and the case was reassigned during the same month to Judge Gelpí. Judge Gelpí did not undo any of Judge Domínguez's earlier orders and there is no indication that the transition was unwieldy.

The appellants have given no coherent explanation as to how these reassignments caused delay. The first reassignment was so immediate that it hardly is worth mentioning. The second reassignment — from Judge Domínguez to Judge Gelpí — resulted in what appears to have been a seamless transition. We cannot infer any good reason for the appellants' delay from that scenario.

The appellants touched upon other grounds below in support of their motion to amend. Specifically, they adverted to the "very special interest to the public trust"; difficulty in understanding the case; and an alleged public loss of over $600 million. These arguments were not renewed on appeal and, therefore, are deemed abandoned. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In all events, they do not come close to suggesting an abuse of discretion.

Relatedly, the appellants assign error to the district court's summary denial of their motion for reconsideration of the order denying leave to file a second amended complaint. We review

the denial of a motion to reconsider for abuse of discretion.  See Mulero-Abreu v. P.R. Police Dep't, 675 F.3d 88, 94 (1st Cir. 2012). "For such a motion to succeed, the movant must demonstrate either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law."  Id. (internal quotation marks omitted).  The appellants do not identify any newly discovered evidence, and the court below committed no discernable errors of law.  Accordingly, we find no abuse of discretion in the denial of reconsideration.

There is one loose end.  The appellants invite us, without meaningful elaboration, to remand the case for an assessment of federal question jurisdiction under yet another statute: the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 to 80a-64.  They are grasping at straws and, inasmuch as they have offered no developed argumentation on the point, we decline their invitation.  See Zannino, 895 F.2d at 17.

We need go no further.  For the reasons elucidated above, we affirm the judgment of the district court.  This order operates without prejudice to the right of the appellants to pursue their claims against the appellees in a local court.

**Affirmed.**