FILED

2/26/2014

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP Nos. NV-13-1188-TaJuKi |
| | NV-13-1189-TaJuKi |
| STEPHEN FLANAGAN and CHARLOTTE FLANAGAN, | |
| | Bk. No. 11-52228-BTB |
| Debtors. | Adv. No. 11-05091-BTB |
| | |
| ROBERT KEETON, | |
| Appellant/Cross-Appellee, | |
| v. | **MEMORANDUM**[*] |
| STEPHEN FLANAGAN, | |
| Appellee/Cross-Appellant. | |

Argued and Submitted on January 24, 2014
at Las Vegas, Nevada

Filed - February 26, 2014

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Bruce T. Beesley, Bankruptcy Judge, Presiding

Appearances:    Jeffrey J. Jarvi of Law Offices of Jeffrey J. Jarvi argued for appellant/cross-appellee Robert Keeton; Kevin Darby of The Darby Law Practice argued for appellee/cross-appellant Stephen Flanagan.

Before:  TAYLOR, JURY, and KIRSCHER, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

1

Appellant/Cross-Appellee Robert Keeton ("Keeton") commenced an adversary proceeding against Debtor and Appellee/Cross-Appellant Stephen Flanagan[1] ("Flanagan"), seeking a nondischargeability determination under § 523(a)(2)(A), (a)(4), (a)(6), and (a)(19).[2]  The claims, in part, were based on Flanagan's alleged violations of the Alaska Unfair Trade Practices and Consumer Protection Act ("UTPA") and the Alaska Securities Act ("Securities Act").

After a two day trial, the bankruptcy court granted judgment ("Judgment") in Keeton's favor based on false pretenses under § 523(a)(2)(A) and embezzlement under § 523(a)(4).  It determined, however, that Keeton failed to prove Flanagan's violation of the UTPA or the Securities Act, and thus it denied the § 523(a)(6) and (a)(19) claims.

Keeton appeals from the bankruptcy court's determination that Flanagan did not violate the UTPA or Securities Act; its denial of stay relief to proceed in an existing Alaska state court action; and its denial of his post-trial motion for prejudgment interest and attorney's fees and costs under Alaska law.

---

[1] Flanagan filed a joint bankruptcy petition with his wife. Mrs. Flanagan, however, was not a named party in the adversary proceeding and is not a party to this appeal.

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.  References to "LBR" are to the Local Rules of Bankruptcy Practice of the United States District Court for the District of Nevada.

2

Flanagan cross-appeals from the bankruptcy court's nondischargeability determinations under § 523(a)(2)(A) and (a)(4). He also contends that the bankruptcy court committed reversible error when it ordered him, mid-trial, to turn over all documents that he reviewed in preparation for trial to opposing counsel.

For the reasons explained below, we AFFIRM the bankruptcy court, except as to its § 523(a)(4) determination and its denial of attorney's fees and costs under Alaska law. We REVERSE the Judgment as to the § 523(a)(4) claim. Further, we REVERSE that portion of the bankruptcy court's order denying fees and costs and REMAND solely on that issue for further proceedings consistent with this decision.

**FACTS**

Keeton and Flanagan are former military and either currently or intermittently served as pilots for the same major airline.

In 2005, Flanagan – through his company GPS Development, LLC – began plans to develop a mixed-use residential and commercial redevelopment project ("Redevelopment Project") in a suburb of Minneapolis, Minnesota. Keeton dabbled in real estate and, in 2006, became acquainted with another airline pilot, Michael Hill ("Hill"), who represented himself as a loan broker and eventually mentioned the Redevelopment Project.

Hill informed Keeton that he secured approval for a $20 million loan ("$20M Loan"), but that the loan was contingent on the procurement of bank guarantees; the guarantees, in turn, were predicated on an advanced origination fee of 1% or $200,000. As Keeton later learned, the "lender" was joint venture partners

Ultima Group II, LLC and Florida Institute of Applied Technology (jointly hereafter, "FIAT"). Hill then asked Keeton if he could provide Flanagan with the $200,000 origination fee.

Whether driven by altruism or financial motives, Keeton agreed to provide Flanagan with $200,000 (the "Funds"). The transaction was memorialized in a letter ("Agreement") dated June 25, 2007, addressed to Keeton, and signed by Flanagan. The Agreement, which identified FIAT as the lender, provided that Keeton would supply the Funds and that the Funds would be held in escrow until Flanagan obtained the bank guarantees (and, presumably, the $20M Loan) or returned to Keeton if the bank guarantees were not obtained. Other terms included: repayment of the "loan" from a first or second draw of financing, estimated to occur after approximately six or seven weeks; a 5% monthly return; and a guaranteed minimum return of $20,000 for the first 60 days, until repayment of the principal.

Keeton attempted to take some protective measures. He sought and obtained an assignment of a second mortgage held by Flanagan and his wife; the second mortgage encumbered real property located at or near the site of the Redevelopment Project. Prior to the assignment, he verified the value of the real property with an appraiser retained by Flanagan. At Keeton's insistence, the parties also entered into an escrow agreement with a Minneapolis title company; the latter acted as the escrow agent and handled the exchange of the Funds and recordation of the second mortgage assignment.

Things ultimately did not go as planned. Upon confirmation that the second mortgage assignment was recorded, the title

4

company wired the Funds to Flanagan, who, in turn, wired the Funds to FIAT. Once the Funds were transferred to FIAT, they were placed into a risky investment platform that offered incredible (even outlandish) payouts tied to the investment contribution, such as an 80-to-1 leveraged payout. The investment, unsurprisingly, did not pay out and Flanagan lost the Funds. He then failed to repay Keeton the $200,000.

In 2008, a senior secured lender foreclosed on Keeton's real property collateral; the foreclosure yielded nothing for Keeton.[3] Several months later, Keeton sued Flanagan in Alaska state court and asserted claims based on alleged violations of the UTPA and the Securities Act. The case proceeded over three years and was scheduled for a bench trial on August 1, 2011. But just three weeks before trial, Flanagan filed his bankruptcy. Keeton's adversary proceeding followed shortly thereafter; the amended adversary complaint sought a nondischargeability determination of the $200,000 based on: false pretenses and false representation under § 523(a)(2)(A); embezzlement under § 523(a)(4); conversion under § 523(a)(6); violation of the UTPA under § 523(a)(6); and violation of the Securities Act under § 523(a)(19).

Keeton also moved for stay relief to allow trial to proceed in the Alaska state court action. The bankruptcy court denied this motion.

---

[3] We exercise our discretion to take judicial notice of documents electronically filed in the underlying bankruptcy case and adversary proceeding. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957–58 (9th Cir. 1989); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

On January 17 and 18, 2013, the bankruptcy court held a two-day trial in the nondischargeability action; both Keeton and Flanagan testified. The bankruptcy court subsequently entered the Judgment and its findings of fact and conclusions of law. It determined that Keeton's claim was nondischargeable based on false pretenses under § 523(a)(2)(A) and embezzlement under § 523(a)(4); it denied all of Keeton's other claims.

Keeton appeals from the Judgment and Flanagan cross-appeals. Keeton also appeals from the denial of his post-trial motion for prejudgment interest and attorney's fees and costs under Alaska law.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

**ISSUES**

Keeton contends that the bankruptcy court committed reversible error as follows: (A) not awarding treble damages under the UTPA after determining that Flanagan engaged in false pretenses and embezzlement; (B) denying relief under the Securities Act; (C) not "remanding" the Securities Act claim to the Alaska state court for adjudication of that claim; and (D) denying his post-trial motion for add-ons of prejudgment interest and attorney's fees and costs under Alaska law.

Flanagan, in turn, asserts that the bankruptcy court committed reversible error as to the following: (A) determining that Keeton's claim was excepted from discharge based on false pretenses under § 523(a)(2)(A); (B) determining that Keeton's

6

claim was excepted from discharge based on embezzlement under § 523(a)(4); and (C) ordering him to turn over to Keeton's counsel, during trial, all materials that he reviewed in preparation for trial.

**STANDARDS OF REVIEW**

Whether a claim is excepted from discharge presents mixed issues of law and fact, which we review de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009), aff'd, 407 F. App'x 176 (9th Cir. 2010). We also review de novo issues of statutory construction. B-Real, LLC v. Chaussee (In re Chaussee), 399 B.R. 225, 229 (9th Cir. BAP 2008). Under de novo review, we consider a matter anew, as if it had not been heard before, and as if no decision had been previously rendered. Id.

Pure questions of fact and the bankruptcy court's underlying factual findings are reviewed for clear error. Deitz v. Ford (In re Deitz), 469 B.R. 11, 24-25 (9th Cir. BAP 2012); de la Salle v. U.S. Bank, N.A. (In re de la Salle), 461 B.R. 593, 601 (9th Cir. BAP 2011); In re Weinberg, 410 B.R. at 28.

We review the following determinations for an abuse of discretion: denial of stay relief, an award of prejudgment interest, and a determination on attorney's fees. See Gruntz v. Cnty of L.A. (In re Gruntz), 202 F.3d 1074, 1084 n.9 (9th Cir. 2000) (denial of stay relief); In re Weinberg, 410 B.R. at 37 (prejudgment interest award); Bertola v. N. Wisc. Produce Co. (In re Bertola), 317 B.R. 95, 99 (9th Cir. BAP 2004) (attorney's fees).

Review of an abuse of discretion determination involves a

two-pronged test; first, we determine de novo whether the bankruptcy court identified the correct legal rule for application.  See United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc).  If not, then the bankruptcy court necessarily abused its discretion.  See id. at 1262. Otherwise, we next review whether the bankruptcy court's application of the correct legal rule was clearly erroneous; we will affirm unless its findings were illogical, implausible, or without support in inferences that may be drawn from the facts in the record.  See id. (internal quotation marks omitted).

We may affirm on any basis in the record.  Caviata Attached Homes, LLC v. U.S. Bank, N.A. (In re Caviata Attached Homes, LLC), 481 B.R. 34, 44 (9th Cir. BAP 2012).

**DISCUSSION**

**I.**

We first address Keeton's issues on appeal.

**A. The bankruptcy court did not err by declining to award treble damages under the UTPA.**

Keeton argues that the bankruptcy court erred by not trebling damages and awarding full attorney's fees under the UTPA after finding that Flanagan engaged in false pretenses and embezzlement.  He advances two arguments in support of his position:  first, that the bankruptcy court erred by entering the Judgment for an amount less than $600,000 when, on the first day of trial, it established that the amount of Keeton's claim was $600,000 and was not at issue; and second, that the bankruptcy court's determinations as to false pretenses and embezzlement are both a per se and a general violation of the UTPA and, thus, that

8

the bankruptcy court erred by not awarding relief under the UTPA. We construe the second argument as an appeal of bankruptcy court's denial of the § 523(a)(6)[4] claim. We first address the latter argument.

### 1. Violation of the Alaska UTPA

The Alaska UTPA[5] provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are . . . unlawful." Alaska Stat. § 45.50.471(a). Once a UTPA violation is established, the injured party may recover $500 or treble damages, whichever is greater. Alaska Stat. § 45.50.531(a). Such damages are awarded as a matter of course and do not constitute punitive damages. Kenai Chrysler Ctr., Inc. v. Denison, 167 P.3d 1240, 1259 (Alaska 2007).

To establish a prima facie case of unfair or deceptive acts or practices, the plaintiff must prove: (1) that the defendant was engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice occurred. Alaska Interstate Const., LLC v. Pac. Diversified Invs., Inc., 279 P.3d 1156, 1163 (Alaska 2012).

Keeton contends that false pretenses and embezzlement are

---

[4] Section 523(a)(6) excepts a debt from discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity." See also Black v. Bonnie Springs Family Ltd. P'ship (In re Black), 487 B.R. 202, 211 (9th Cir. 2013) (elements of a § 523(a)(6) claim).

[5] The UTPA is codified at Alaska Stat. §§ 45.50.471 – 45.50.561.

9

per se violations of Alaska Stat. § 45.50.471(b)(14).[6] He also contends that these determinations establish a general violation of the UTPA.

Alaska courts have generally construed the "engaged in trade or commerce" prong "to encompass **purchases of goods and services** in business-to-business commercial transactions as well as in individual consumer transactions." Alaska Interstate Const., LLC, 279 P.3d at 1169 (emphasis added); cf. W. Star Trucks, Inc. v. Big Iron Equip. Serv., Inc., 101 P.3d 1047, 1051-52 (Alaska 2004) (application of ejusdem generis to Alaska Stat. § 45.50.471(b) did "not serve to distinguish between transactions based on commercial and consumer **products or services**.") (emphasis added); Alaska Stat. § 45.50.561(4) (defining "consumer" as "a person who seeks or acquires **goods or services** by lease or purchase.") (emphasis added); Alaska Stat. § 45.50.561(9) ("'goods or services' includes goods or services provided in connection with a consumer credit transaction or with a transaction involving an indebtedness secured by the borrower's residence.").

In a broader context, "goods" is defined as "[t]angible or movable personal property **other than money**; esp., articles of trade or items of merchandise <goods and services>." Black's Law Dictionary (9th ed. 2009) (emphasis added). As relevant here, this description is buttressed by the definitions of "commerce":

---

[6] Alaska Stat. § 45.50.471(b)(14) provides that an act or practice is unfair or deceptive if it "represent[s] that an agreement confers or involves rights, remedies, or obligations which it does not confer or involve, or which are prohibited by law."

"[t]he exchange of goods and services, esp. on a large scale involving transportation between cities, states, and nations," and of "trade": "[t]he business of buying and selling or bartering goods or services; COMMERCE."  Id.

Furthermore, it is well-established that, under Alaska law, real estate transactions do not fall within the scope of the UTPA.[7]  State v. First Nat. Bank of Anchorage, 660 P.2d 406, 414 (Alaska 1982); see also Aloha Lumber Corp. v. Univ. of Alaska, 994 P.2d 991, 1002 (Alaska 1999) (standing timber was not a "good" for the purposes of the UTPA); Roberson v. Southwood Manor Assocs., LLC, 249 P.3d 1059, 1061 (Alaska 2011) (distinction between real property transactions and non-real property transactions is particularly relevant where consumer goods are involved).

Against this backdrop, Flanagan was not "engaged in trade or commerce" for the purposes of the UTPA.  There is nothing in the record to suggest that the transaction between Keeton and Flanagan involved the purchase, sale, or exchange of a good or service, as contemplated by the UTPA.  Nor does the record suggest that Flanagan was a broker or otherwise involved in the loan services industry.  The bankruptcy court found that Flanagan was not in the loan services business and Keeton does not challenge this finding on appeal.

On this record, the bankruptcy court did not err in determining that Keeton failed to meet the first prong for a

---

[7] But see Alaska Stat. § 45.50.471(52) (scope of UTPA encompasses mortgage lending regulation).

11

prima facie UTPA violation. As a result, it did not err when it declined to award treble damages under the UPTA.

2. Amount of Judgment

Keeton also asserts that the bankruptcy court erred in entering the Judgment for less than $600,000 when it expressly ruled that the amount of the debt was undisputed and established at trial.

It is true that, on the first morning of the two-day trial, the bankruptcy court stated that the amount of Keeton's claim was "presumptively resolved" in the amount of $600,000, as scheduled by Flanagan and his co-debtor spouse. Trial Tr. (Jan. 17, 2013), Vol. 1 at 8:3-4. But, to the extent that Keeton argues that the bankruptcy court was somehow estopped from entering a different (and reduced) judgment amount, we reject his argument. Keeton advances absolutely no case authority or reasoning in support of such an argument.

Moreover, just a few minutes after announcing that the claim amount was presumptively resolved, the bankruptcy court further stated to Keeton: "you would be entitled to **whatever you're entitled to under a 523 action** . . . ." Id. at 10:10-11 (emphasis added). The bankruptcy court's statement as to the $600,000 amount was, at best, an interim ruling based on the facts known to it prior to trial. Once the bankruptcy court conducted the trial, it was well within its discretion to adjust the judgment based on the evidence presented and relief granted to Keeton. Here, the $600,000 amount was based on trebled damages under a presumptive UTPA violation. As the bankruptcy court determined that Flanagan did not violate the UTPA, there

12

was no statutory basis to treble the $200,000 judgment. In this regard, neither Flanagan's scheduled claim nor the bankruptcy court's statements at trial were dispositive as to the final judgment amount.

Based on the foregoing, the bankruptcy court did not err in entering the Judgment for less than $600,000.

**B.    The bankruptcy court did not err in denying the § 523(a)(19) claim.**

Section 523(a)(19) excepts from discharge certain debts arising from violation of state or federal securities laws or for common law fraud, deceit, or manipulation in connection with the purchase or sale of a security.

Keeton next assigns error to the bankruptcy court's determination that the Agreement was not an "investment contract" and, thus, not a "security" as defined by the Securities Act. In support of his argument, he contends that: (1) the Agreement contained the terms "investment," "investor," and "return on investment"; (2) in written discovery Flanagan admitted that the Agreement referred to an "investment" and denied any characterization as a loan; (3) Flanagan was a licensed sales representative in Nevada for a financial services company; and (4) as the sole member and manager of GPS Development, Flanagan's managerial efforts were essential to the success or failure of the Redevelopment Project.

We review de novo the bankruptcy court's determination as to whether a transaction was a security. See Warfield v. Alaniz, 569 F.3d 1015, 1019 (9th Cir. 2009) (observing that "[a]lthough characterization of a transaction raises questions of both law

13

and fact, the ultimate issue of whether or not a particular set of facts, as resolved by the factfinder, constitutes an investment contract is a question of law.").

Section 45.55.010(a) of the Securities Act[8] provides that "[a] person may not, in connection with the offer, sale, or purchase of a **security**" employ fraud; make an untrue statement of or omit a material fact; or engage in conduct that would operate as fraud or deceit. (Emphasis added). Section 45.55.930(a)(2) provides for civil liability for the offer or sale of a **security** by means of an untrue statement of or an omission of material fact. Both statutory provisions, hence, are predicated on a transaction involving a "security."

Under Alaska law, a "security" encompasses, among other things, an "investment contract." Alaska Stat. § 45.55.990(32). While this term is not statutorily defined, Alaska has adopted the test for an "investment contract" as set forth in Sec. & Exch. Comm'n v. W.J. Howey Co., 328 U.S. 293 (1944), and refined by Sec. & Exch. Comm'n v. Glenn W. Turner Enters., Inc., 474 F.2d 476 (9th Cir. 1973). See Am. Gold & Diamond Corp. v. Kirkpatrick, 678 P.2d 1343, 1345 (Alaska 1984). As a result, for the purposes of the Alaska Securfies Act, an "investment contract" refers to a contract, transaction or scheme where a person (1) invests money; (2) in a common enterprise; and (3) expects profits to be produced by the essential managerial efforts (which affect the failure or success of the enterprise)

_____

[8] The Securities Act is codified at Alaska Stat. §§ 45.55-010 - 45.55.995.

14

of others. Id. (citing W.J. Howey Co., 328 U.S. at 298-99; Glenn W. Turner Enters., Inc., 474 F.2d at 482-43)); see also United Hous. Found., Inc. v. Forman, 421 U.S. 837, 852 (1975).

The first "money investment" prong "requires that the investor commit his assets to the enterprise in such a manner as to subject himself to financial loss." See Warfield, 569 F.3d at 1021 (quotation marks omitted). Actual loss is immaterial; instead, the inquiry is focused on the existence of risk of loss to the investor. Id.

Keeton's transfer of the Funds to Flanagan subjected him to financial loss. Indeed, an actual loss occurred. Even so, all loans entail some risk of loss. Here, the character of loss could be consistent with both a loan and an investment. Also, generally speaking, the contribution of money must be exchanged for the prospect of financial gain. See id. (contribution of money in exchange for promise of annuity payments and payment of remaining funds at end of annuitant's life to designated charities); Sec. & Exch. Comm'n v. Rubera, 350 F.3d 1084, 1091 (9th Cir. 2003) (contribution of money in exchange for financial gains). Arguably, Keeton's anticipated receipt of interest could constitute the requisite financial gain.

For the purposes of the second prong, "common enterprise" means "that the investor's financial interests must be 'inextricably interwoven' with those" other than the investor. Hentzner v. State, 613 P.2d 821, 824 (Alaska 1980). Here, the record shows that Keeton's financial interest in the transaction was the repayment of the Funds by Flanagan. There is nothing in the record to suggest that Keeton stood to gain anything from the

15

FIAT transaction or the Redevelopment Project – other than repayment of the Funds and interest thereon. Thus, it mattered not, from Keeton's viewpoint, whether Flanagan was successful in his venture, as Keeton was to be repaid whether or not Flanagan obtained the bank guarantees or $20M Loan or realized a profit from the Redevelopment Project. In other words, the repayment obligation was not tied to the success of an investment.

The third "expectation of profits" prong requires that the investor be led to expect profits from essential managerial efforts, those which affect the failure or success of the enterprise, of those other than the investor. See Rubera, 350 F.3d at 1091-92. Applied to the facts here, there again is a critical missing component: an expectation of profit by Keeton.

The Agreement admittedly contains various references to "returns." The bankruptcy court found, however, that Flanagan drafted the Agreement without the assistance of an attorney. That finding was not challenged on appeal. Thus, the plain meaning of the terms used in the Agreement is not dispositive as to the issue here. These references, instead, appear to relate to an interest rate on the principal balance of a loan rather than traditional investment terms. Again, there is nothing in the Agreement – or in the record – to suggest that Keeton's repayment was tied to the success of the FIAT "financing" or the Redevelopment Project; nor is there anything to suggest that Keeton would receive any revenue, income, or other type of profit. Once Flanagan repaid the Funds, Keeton was not entitled to further remuneration. Fatally, Keeton cannot satisfy the "expectation of profits" prong.

16

The short term nature of the loan, the fact that it was collateralized by real property, and the fact that it allegedly was intended to finance a discrete need of the Redevelopment Project also support a determination that this transaction involved a loan. See Caucus Distribs., Inc. v. State, 793 P.2d 1048, 1054-1055 (Alaska 1990).

As such, the bankruptcy court did not err in determining that the Agreement was not an "investment contract" for the purposes of the Securities Act. Therefore, it did not err in denying the nondischargeability claim under § 523(a)(19).

**C.    The bankruptcy court did not err in denying Keeton's "renewed" motion for stay relief.**

Next, Keeton asserts that the bankruptcy court erred in failing to remand the Securities Act claim for determination by the Alaska state court. He maintains that the bankruptcy court denied his multiple stay relief motions and that these denials constitute reversible error.

As a preliminary matter, the term "remand," as used by Keeton here, is inapt. The record reflects that Keeton never removed the Alaska state court action (or any claim thereunder) to the bankruptcy court. As a result, there was no existing claim or action that the bankruptcy court could "remand" to the Alaska state court.

More importantly, however, none of the denials for stay relief are properly before this Panel. And, other than inclusion of the transcript where Keeton's counsel orally "renewed" his stay relief motion, Keeton did not include in the record on appeal the other denials of stay relief.

17

Taking judicial notice of the bankruptcy case docket,[9] we observe that the bankruptcy court entered an order denying stay relief on July 2, 2012. Keeton did not appeal from the denial order and that order is now final and not subject to further review by this Panel. See Kamai v. Long Beach Mortg. Co. (In re Kamai), 316 B.R. 544, 547 (9th Cir. BAP 2004) (order denying a stay relief motion is a final, appealable order).

It, thus, appears that Keeton correctly only appeals from the bankruptcy court's denial of the stay relief motion that he orally "renewed" at trial.

Generally speaking, a party may not orally move for stay relief, let alone orally "renew" a stay relief motion. See Fed. R. Bankr. P. 4001(a)(1) (stay relief motion governed by Rule 9014); Fed. R. Bankr. P. 9014(a) (requiring reasonable notice and opportunity for a hearing); LBR 4001; LBR 9014.[10] As a result, the orally renewed stay relief motion – and denial thereof – are not properly before us for review.

And even if we review the merits, the bankruptcy court did not abuse its discretion in denying the requested relief. Keeton's oral motion was based on the revelation on the second morning of trial that Flanagan's brother was a Nevada state court

[9] See supra note 3.

[10] Moreover, a party seeking stay relief must pay a statutorily prescribed filing fee. See Judicial Conference Schedule of Fees, Bankruptcy Court Miscellaneous Fee Schedule at No. 19 (effective May 1, 2013), issued in accordance with 28 U.S.C. § 1930. By orally renewing the stay relief motion during trial, Keeton could not have paid the requisite filing fee.

18

judge and friend of the bankruptcy judge. Keeton pointed out that he did not know any judges in Alaska or family members of judges in Alaska and reiterated that the Alaska state court was in a better position to not only determine the Securities Act claim but also to determine whether it was nondischargeable under § 523(a)(19).

The bankruptcy court denied the motion, reasoning that the parties were halfway through trial and that, in any event, it could render a fair judgment notwithstanding the acquaintance with Flanagan's brother. Upon Flanagan's allegedly inadvertent disclosure of the relationship, the bankruptcy court took a brief recess to consider the matter and then made a full disclosure on the record.[11]

Even if the bankruptcy court determined that this situation constituted an appropriate basis for recusal, such a motion and determination is made under 28 U.S.C. § 455 – not § 362(d). This situation does not lend itself to establishing a basis for "cause" under § 362(d)(1).

The orally "renewed" stay relief motion was procedurally and substantively improper but, in any event, the bankruptcy court did not err in denying the stay relief motion.

[11] This included that he and Flanagan's brother served together for a couple of years in the Washoe County Public Defender's Office a little over 30 years ago, previously served on a board together for the State Bar of Nevada, and had lunch a few times a year.

19

**D. The bankruptcy court did not err in denying Keeton's post-trial motion for prejudgment interest; it erred, however, in denying the motion for fees and costs.**

Finally, Keeton contends that the bankruptcy court erred in denying his post-trial motion ("Post-Judgment Motion") for prejudgement interest and attorney's fees and costs under Alaska law. Based on <u>Cohen v. de la Cruz</u>, 523 U.S. 213 (1998), he argues that he is entitled to: (1) prejudgment interest on the principal amount of $200,000 under Alaska Stat. § 09.30.070; (2) partial attorney's fees under Alaska Civil Rule 82(b)(1); and (3) partial costs under Alaska Civil Rule 79(f).

### 1. <u>Jurisdiction</u>

Flanagan argues that once Keeton filed his notice of appeal of the Judgment, the bankruptcy court was divested of jurisdiction to adjudicate the Post-Judgment Motion and, thus, it did not err in denying the motion. In response, Keeton asserts, as he did below, that the Post-Judgment Motion falls under Rule 8002(b)(4) and, thus, that Flanagan's argument is incorrect as a matter of law. Flanagan is incorrect and Keeton confuses the issue.

A bankruptcy court has ancillary jurisdiction despite an appeal to dispose of factually interdependent claims and to vindicate its authority and effectuate its decrees. <u>See</u> <u>Battle Ground Plaza, LLC v. Ray (In re Ray)</u>, 624 F.3d 1124, 1135 (9th Cir. 2010). The scope of this type of jurisdiction necessarily includes an award of fees and costs related to the underlying proceeding. <u>See</u> <u>Tsafaroff v. Taylor (In re Taylor)</u>, 884 F.2d 478, 481 (9th Cir. 1989) (application for an award of fees

20

incurred in connection with the underlying proceeding is an ancillary matter).

The bankruptcy court here awarded Keeton "reasonable attorney's fees and costs" in the Judgment. In the Post-Judgment Motion, Keeton simply sought to liquidate the award that the bankruptcy court already granted. The request was not one for new relief independent of the Judgment. See Aheong v. Mellon Mortg. Co. (In re Aheong), 276 B.R. 233, 240 (9th Cir. BAP 2002) (ancillary jurisdiction does not extend to new relief independent of the bankruptcy court's prior rulings). As a result, the bankruptcy court appropriately possessed ancillary jurisdiction over the Post-Judgment Motion.

2. Prejudgment interest

If a nondischargeable debt arose under state law, prejudgment interest is also governed by state law. In re Weinberg, 410 B.R. at 37. Here, the bankruptcy court resolved that nondischargeability actions under § 523(a) were purely matters of federal law and, thus, subject to an interest rate governed by federal law. As Keeton prevailed on federal claims, it concluded that he was entitled to prejudgment interest at the federal interest rate.

The bankruptcy court did not err in identifying the correct rule of law. The nondischargeability determination was made under § 523(a)(2)(A) and (a)(4), both of which constitute claims under the federal Bankruptcy Code. The bankruptcy court applied the standards developed under federal bankruptcy law in order to adjudicate the claims; there was no implication of Alaska state law as to either the § 523(a)(2)(A) or (a)(4) claims. The

21

adversary complaint shows that Keeton did not plead either claim under Alaska common law.  In sum, neither determination - under § 523(a)(2)(A) or (a)(4) - was animated in any manner by Alaska state law.  Therefore, the bankruptcy court did not abuse its discretion in determining that Keeton was entitled to prejudgment interest at the federal interest rate, rather than under Alaska law.

### 3. Attorney's fees and costs

Keeton also argues that the bankruptcy court erred in denying his request for attorney's fees and costs under Alaska law.  We agree.

Generally, under the American Rule, a prevailing party is not entitled to recovery of attorney's fees except as provided by contract or statute.  Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec., Co., 549 U.S. 443, 448 (2007).  In turn, there is no general right to fee recovery under the Bankruptcy Code.  Fry v. Dinan (In re Dinan), 448 B.R. 775, 784 (9th Cir. BAP 2011).

Still, an exception exists with respect to fraud[12] nondischargeability claims.  See In re Bertola, 317 B.R. at 99-100.  As to a § 523(a)(2) claim, the relevant inquiry is whether the plaintiff would be entitled to attorney's fees in state court for establishing those elements of the claim that the bankruptcy court determines support nondischargeability.  See id.

Here, the bankruptcy court determined that Keeton was entitled to fees under Alaska Civil Rule 82.  Noting that the

---

[12] See 11 U.S.C. § 523(c)(1) (bankruptcy court has exclusive jurisdiction over § 523(a)(2), (a)(4), or (a)(6) claims).

22

elements for Alaska common law fraud were substantially similar to those of a § 523(a)(2)(A) claim, it concluded that Keeton would have prevailed under state law and, thus, awarded fees under Alaska law. Notwithstanding, the bankruptcy court subsequently denied Keeton's motion to liquidate the award. Neither party actually challenges the ultimate determination that Keeton was entitled to fees under Alaska Civil Rule 82. Thus, we do not substantively review the propriety of that determination.

Instead, our review of the record indicates that both the parties and the bankruptcy court myopically focused on whether the bankruptcy court retained jurisdiction to adjudicate the Post-Judgment Motion given the existing cross-appeals to this Panel. At the hearing on the motion, the bankruptcy court initially stated that it would continue the matter in order to ascertain the status of the cross-appeals. Keeton's counsel insisted that the bankruptcy court retained jurisdiction pursuant to Rule 8002 and, following some colloquy, the bankruptcy court denied the motion in its entirety. It made no findings and gave no basis for its decision.

Consequently, the bankruptcy court abused its discretion in denying Keeton's request to liquidate the amount for fees and costs. We reverse the bankruptcy court's denial order as to such fees and costs and remand to the bankruptcy court for determination of the appropriate amount of fees and costs determined under Alaska Civil Rule 82.

**II.**

We next address Flanagan's issues on cross-appeal.

23

**A.    The bankruptcy court did not err in determining that Keeton's claim was nondischargeable based on false pretenses under § 523 (a)(2)(A).**

A debt is excepted from discharge for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ." 11 U.S.C. § 523(a)(2)(A).

The creditor must demonstrate the following five elements by a preponderance of the evidence:  (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive the creditor; (4) that the creditor justifiably relied on such representation or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000); see also Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010).

Flanagan does not specifically address the second element in his opening brief – knowledge of the falsity or deceptiveness of his statement or conduct – and, thus, we do not address that element on appeal. See Tracht Gut, LLC v. Cnty. of L.A. Treasurer & Tax Collector (In re Tracht Gut, LLC), 503 B.R. 804, 811 (9th Cir. BAP 2014) (BAP does not ordinarily address matters not argued in the opening brief).

24

### 1. Misrepresentation

Flanagan first contends that the bankruptcy court erred in finding that he made a false representation regarding the use of the Funds because any representation as to the Funds and escrow were not material to Keeton.

Here, the bankruptcy court found that, as evidenced by the Agreement, Flanagan represented that the Funds would be held in an escrow account and that the funds would be promptly returned to Keeton if Flanagan did not obtain the $20M Loan. It found that the FIAT account was not an escrow account, but a leveraged investment platform and, thus, Flanagan's transfer of the Funds into the investment platform constituted a misrepresentation that the Funds would be deposited into an escrow account.

Flanagan does not challenge the finding that the FIAT account was an investment platform. Instead, he argues that the escrow of funds was not a central part of the Agreement or Keeton's understanding of the transaction. The bankruptcy court did not err in concluding that this is incorrect.

Contrary to Flanagan's argument, the Agreement provides that the $200,000 "will be held in escrow **until** the Bank Guarantees (BG) used for funding are obtained." Emphasis added. Keeton testified that, but for the escrow provision, he would not have provided the Funds to Flanagan. That Keeton was aware that the Funds were transferred to FIAT is inconsequential; there is nothing in the record to suggest that Keeton was explicitly aware that the Funds would be transferred into a leveraged investment platform rather than a traditional escrow account by or through FIAT.

25

On this record, the bankruptcy court did not err in finding that Flanagan misrepresented the nature of the transfer of the Funds.

2.   Intent

Flanagan next contends that there was no evidence presented that he intended to deceive Keeton and, thus, that the bankruptcy court erred in finding that he did.  He again argues that he expressly informed Keeton that the Funds would be wired to FIAT and that Keeton signed escrow instructions that permitted the Funds to be released from escrow to FIAT.

Here, the bankruptcy court found that emails exchanged between Flanagan and James Culp of FIAT showed that Flanagan intended to deceive Keeton as to the nature of the account into which the Funds were deposited.

Our review of these emails, dated at or near the time that Keeton provided the Funds to Flanagan, shows that Flanagan instructed Culp to wire a portion of the funds into his personal bank account and to "roll" the other funds into "lines." Flanagan also asked questions regarding "draws"; in particular, in an email dated June 25, 2007, the day before the Agreement is dated, Culp advised Flanagan that the second platform was an "80 to 1 leveraged payout" and, thus, that Flanagan's $200,000 would yield $16 million dollars.

Contrary to his assertion, the emails evidence Flanagan's express intent at the relevant time to transfer the Funds into a leveraged investment platform.  Once again, while Keeton was aware of the imminent transfer of the Funds to FIAT, nothing in the record suggests that Keeton was aware of the nature of the

26

transfer; that is, that the Funds would be put into an investment platform rather than an escrow account at FIAT. Nor was Keeton copied on the emails between Flanagan and Culp. In short, there is nothing to show that Keeton was aware of or had reason to know what the Funds would be used for.

The bankruptcy court's finding of intent to deceive was not illogical, implausible, or without support from the record. Therefore, it did not err in finding that Flanagan intended to deceive Keeton.

### 3. Reliance

Flanagan next argues that Keeton's reliance on his representation, if any, was not justifiable. He contends that the bankruptcy court erred in finding reliance given Keeton's lack of due diligence and failure to ensure the existence of escrow.

Here, the bankruptcy court determined that Keeton's reliance was justifiable based on the common background shared by the parties (military service and pilots at the same major airline), the implicit trust underscoring the relationship based on that background, and the steps taken by Keeton to minimize his risk. In particular, it noted that Keeton ensured there was an agreement in place and that he insisted (and obtained) a second mortgage against Flanagan's property. It found that, based on the common background and assurances against risk, Keeton approached the transaction with a "heightened degree of trust," which justified his reliance on Flanagan's representations. Finally, it found that Keeton's lack of sophistication explained his failure to "seriously question" the terms of the Agreement.

27

Flanagan does not explicitly challenge the finding that Keeton placed a heightened degree of trust on their relationship. Nor does he challenge the finding that the parties were unsophisticated business people with little, if any, finance experience. These findings, in turn, underscore the bankruptcy court's ultimate finding that, notwithstanding Keeton's failure to do certain things, his reliance was justifiable. This consideration was appropriate. See Romesh Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte), 180 B.R. 223, 229-30 (9th Cir. BAP 1995) ("In considering whether reliance is justifiable, the court must take into account the knowledge and relationship of the parties.") (citation and quotation marks omitted).

Again, the bankruptcy court's findings were not illogical, implausible, or without support in the record. Thus, the bankruptcy court did not err in finding justifiable reliance.

4. Damages

Flanagan summarily argues that Keeton failed to prove that his damages, if any, were proximately caused by misrepresentation. He does not actually address proximate cause; instead, he contends that because the representation with respect to escrow was immaterial and Keeton did not justifiably rely on any such representation, any damages incurred by Keeton were not caused by a misrepresentation.

The bankruptcy court determined that Keeton lost $200,000 as a result of Flanagan's transfer of the Funds. This determination is supported by the record, which shows that Keeton provided the Funds to Flanagan, that Flanagan caused the transfer of the Funds into the investment platform at FIAT, and that, as a result,

28

Keeton never received his $200,000 back. Thus, the bankruptcy court did not err in determining that Keeton's $200,000 loss was caused by his reliance on Flanagan's representation.

Based on the foregoing, the bankruptcy court did not err in determining that Keeton's claim for $200,000 was nondischargeable for false pretenses under § 523(a)(2)(A).

**B. The bankruptcy court erred in determining that Keeton's claim was nondischargeable based on embezzlement under § 523(a)(4).**

Section 523(a)(4) excepts a debt from discharge "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." In the context of nondischargeability, embezzlement refers to "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." Moore v. United States, 160 U.S. 268, 269 (1885). There are three elements required to except a debt from discharge under § 523(a)(4): (1) property that was rightfully in the possession of a nonowner; (2) that the nonowner appropriated the property to a use other than which it was entrusted; and (3) circumstances indicating fraud. Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th Cir. 1991) (citation and quotation marks omitted); see also First Del. Life Ins. Co. v. Wada (In re Wada), 210 B.R. 572, 576 (9th Cir. BAP 1997). "[E]mbezzlement requires a showing of wrongful intent." Bullock v. BankChampaign, N.A., 133 S. Ct. 1754, 1760 (2013).

Flanagan argues that the transaction at issue was a loan and that once the title company closed escrow, ownership of the Funds

29

vested in Flanagan. In any event, he argues that the Funds were used exactly as he promised at the time that the Funds were in his control. Keeton does not reply on this point.

As to the first element, the bankruptcy court determined that Flanagan possessed custody but not title to the Funds based on the short-term nature of the Agreement and that the Funds would be repaid imminently. It erred in doing so. Despite the parties' vacillations as to the character of the subject transaction, the bankruptcy court found that the transaction was a loan and so referred to it in its decision. On this record, that decision was not erroneous.

The inquiry then shifts to whether, after receiving the Funds, Flanagan possessed an ownership interest in the money. Broadly speaking (and notwithstanding arrangements or disclaimers to the contrary), upon disbursement, loan proceeds generally belong to the borrower. See Belfry v. Cardozo (In re Belfry), 862 F.2d 661, 662 (8th Cir. 1988) ("Payment of a contract price in exchange for the recipient to undertake an obligation of future performance transfers ownership of the money to the recipient."). Consequently, when a borrower uses properly acquired loan proceeds in an unauthorized manner, in addition to remaining liable on the obligation, there may exist a basis for fraud, as there was here, or breach of contract; but, this situation would not constitute embezzlement in as much as the borrower owns the proceeds. See also Teamsters Local 533 v. Schultz (In re Schultz), 46 B.R. 880, 889-90 (Bankr. D. Nev. 1985) ("One cannot embezzle, steal, or convert one's own property."). Under these circumstances, then, Flanagan could not

30

have been a "nonowner" in possession of the Funds.

The bankruptcy court erred in determining that Keeton's claim for $200,000 was nondischargeable based on embezzlement under § 523(a)(4). We, thus, reverse the Judgment as to the § 523(a)(4) determination.

**C.** **The bankruptcy court's order to turn over any documents used by Flanagan in preparing for trial was harmless error.**

Finally, Flanagan contends that the bankruptcy court erred in ordering him to turn over all materials that he used in preparation for trial to Keeton's counsel during trial. He also alleges error in the bankruptcy court's determination that he waived his attorney-client privilege or attorney work product privilege by reviewing documents or communications from his attorney in preparation for trial. Flanagan argues that these errors prejudiced his ability to participate and prepare for trial and requests that we vacate the Judgment and remand the matter for trial before a new bankruptcy judge.

In his reply, Keeton points out that Flanagan fails to mention that the bankruptcy court immediately stayed enforcement of its order and subsequently "reversed" itself during trial. Thus, he argues that Flanagan was never harmed by the bankruptcy court's "short-lived order."

Our review of the record confirms that Flanagan's argument extols form over substance. At the end of the first day of trial, it became apparent that Flanagan reviewed documents in preparation of testimony that were not produced to Keeton; in particular, this consisted of a document from the title company with respect to a third-party loan or investment and a copy of

31

the third-party check.  The following exchange then occurred:

THE COURT: Okay.  You are directed to produce tomorrow morning to opposing counsel the printout from the title company and the copy of the check.

FLANAGAN: Yes, sir.

THE COURT: And if there's anything else you looked at that you see you are also directed to produce that.

FLANAGAN: Yes, sir.

COUNSEL: Your Honor, he may be looking at memos that I prepared to him that are attorney --

THE COURT: That's too bad.

COUNSEL: So anything -- I mean, do you want to pry the case law that he said he reviewed in preparation for today?

THE COURT: If he looked at something in preparation for his testimony, opposing counsel is entitled to see it.

COUNSEL: Even if it's a communication from me to him.

THE COURT: Yes. You shouldn't let him do that.

Trial Tr. (Jan. 17, 2013), Vol. 2 at 168:6-8.

First thing the following morning, however, the bankruptcy court stated that it was staying enforcement of its order until further review.  Apparently, Flanagan moved for reconsideration of the bankruptcy court's order immediately after the first day of trial concluded.  It appears that the stay referred to the blanket turnover order, as three documents[13] were then reviewed by Keeton's counsel on the record.  Later that afternoon, the

---

[13] Ostensibly, these documents related to the title company document and copy of the check at issue during the first day of trial, but this is not entirely clear from the record.

32

bankruptcy court stated that it was not going to order the production of Flanagan's other documents.

Based on our review of the record, the bankruptcy court's order was of short duration and did not result in the production of any privileged material. To the extent that it initially ordered Flanagan to produce any materials reviewed in preparation for trial, it did so at the end of the first day of trial and then immediately stayed enforcement of its order the following morning. The bankruptcy court then determined that no further production of documents was necessary.

Flanagan does not specifically articulate any harm or damage incurred as a result of the bankruptcy court's order, other than he was precluded from participating in or preparing for trial. As to the former, it is unclear what Flanagan is referring to as the record shows that he continued to testify – under oath – at trial. As to the latter, as stated, the initial order was made at the end of the day of the first day of trial; we assume that most trial preparation occurred prior to the start of trial.

Instead, here, Flanagan produced only three documents to Keeton's counsel for review, seemingly based on Federal Rule of Evidence 612(a)(2). Flanagan, however, does not identify any privileged document that he was forced to produce. In fact, the record shows that Flanagan's counsel stated at trial that he did not review any materials with Flanagan and that Flanagan had not reviewed any communication from him. As a result, to the extent the bankruptcy court initially ordered production of all documents reviewed, it vacated its order when it determined that Flanagan was not required to produce any additional documents.

33

Any error was, thus, harmless. <u>See</u> Fed. R. Civ. P. 61 (incorporated into bankruptcy proceedings by Rule 9005).

**CONCLUSION**

We AFFIRM the bankruptcy court as to its determinations on the § 523(a)(2)(A), (a)(6), and (a)(19) claims. We REVERSE its determination as to the § 523(a)(4) claim. We AFFIRM its award of prejudgment interest at the federal interest rate; but we REVERSE its denial of attorney's fees and costs under Alaska law and REMAND to it the sole issue of fees and costs for further proceedings consistent with this decision.