**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| U.S. SECURITIES & EXCHANGE COMMISSION, *Plaintiff-Appellee*, v. HUI FENG; LAW OFFICES OF FENG AND ASSOCIATES PC, *Defendants-Appellants*. | No. 17-56522 D.C. No. 2:15-cv-09420-CBM-SS OPINION |

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted May 16, 2019
Pasadena, California

Filed August 23, 2019

Before: Kermit V. Lipez,[*] Kim McLane Wardlaw,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Lipez

---

[*] The Honorable Kermit V. Lipez, United States Circuit Judge for
the First Circuit, sitting by designation.

# SUMMARY[**]

## Securities & Exchange Commission

The panel affirmed the district court's summary judgment in favor of the U.S. Securities and Exchange Commission ("SEC") in its civil complaint filed against Hui Feng and his law firm, alleging securities fraud.

The U.S. Immigrant Investor Program, also known as the EB-5 program, provides legal permanent residency in the United States to foreign nationals who invest in U.S.-based projects. Multiple foreign investors may pool their money in the same enterprise, and these pooled investments are made through "regional centers" which are regulated by the U.S. Citizenship and Immigration Services.

Feng legally represented clients through the EB-5 process, and entered into marketing agreements with regional centers. The basis of the agreements between the regional centers and Feng's investors were known as private placement memoranda ("PPMs").

The panel agreed with the district court that the EB-5 investments in this case constituted "securities" in the form of investment contracts. The panel rejected Feng's argument that the transactions were not "securities" because his clients did not expect profits from their investments. Specifically, the panel held that the  PPMs' identification of the investments as securities, the form of the investment entity

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

as a limited partnership, and the promise of a fixed rate of return all indicated that the EB-5 transactions were securities. The panel rejected Feng's contention that the administrative fees upended the expectation of profits. The panel also rejected Feng's assertion that his clients lacked an expectation of profit because they were motivated to participate in the EB-5 program by the promise of visas, not by profit.

Concerning the cause of action that Feng failed to register as a broker in violation of Section 15(a) of the Securities and Exchange Act of 1934, the panel agreed with the district court's conclusion that Feng was acting as a broker and violated the registration requirement. The panel held that the district court properly made its broker determination by utilizing the totality-of-the-circumstances approach by relying on the so-called *Hansen* factors. The panel rejected Feng's arguments that the broker registration requirement should not apply to his circumstances.

The panel affirmed the district court's finding that Feng engaged in securities fraud in violation of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 based on two theories of fraud liability: material omissions, and schemes to defraud. Concerning material omissions, the panel held that where Feng worked as both a broker and an immigration attorney, he had fiduciary duties to his clients, including the obligation to disclose conflicts of interest. Here, there was a risk that Feng's judgment would be swayed by the promise of a commission from the regional center, and this presented a conflict with Feng's representation of a client, which he failed to disclose to his clients, and this failure was material. Concerning schemes to defraud, the panel affirmed the district court's findings that Feng defrauded the regional

centers that refused to pay commissions to U.S.-based attorneys not registered as brokers, and defrauded clients who sought a reduction in their administrative fees.

Finally, the panel held that the district court did not abuse its discretion in entering a disgorgement order. The district court calculated that Feng received $1.268 million for commissions in connection with the EB-5 program, and ordered disgorgement of the entire amount.

## COUNSEL

Andrew B. Holmes (argued) and Matthew D. Taylor, Holmes Taylor Scott & Jones LLP, Los Angeles, California, for Defendant-Appellant Law Offices of Feng & Associates.

Hui Feng (argued), Law Offices of Feng & Associates, Flushing, New York, for Defendant-Appellant Hui Feng.

Kerry J. Dingle (argued), Senior Counsel; Jeffery A. Berger, Senior Litigation Counsel; Michael A. Conley, Solicitor; Robert B. Stebbins, General Counsel; Securities & Exchange Commission, Washington, D.C.; for Plaintiff-Appellee.

**OPINION**

LIPEZ, Circuit Judge:

This appeal requires us to decide whether certain investments made by participants in the U.S. Immigrant Investor Program are "securities" subject to regulation by the Securities and Exchange Commission ("SEC") and, if so, whether appellant Hui Feng was a securities "broker" required to register with the SEC and whether he committed securities fraud in connection with the transactions.[1] The district court granted summary judgment for the SEC. We affirm.

## I.

### A. The EB-5 Program

The U.S. Immigrant Investor Program, colloquially referred to as the EB-5 program, provides legal permanent residency in the United States to foreign nationals who invest in U.S.-based projects. *See* 8 U.S.C. § 1153(b)(5)(A).[2] Generally, qualified immigrants may gain U.S. visas through direct investment of at least $1 million in a new commercial enterprise that creates at least ten full-time jobs for U.S. workers. *Id.* § 1153(b)(5)(A), (C). Investment in a business in a "targeted employment area"

---

[1] Both Hui Feng and his law firm, the Law Offices of Feng & Associates P.C., are appellants in this matter. The parties' arguments do not distinguish between the two, and so, as a matter of convenience, we refer to the appellants collectively as "Feng."

[2] By statute, the Immigrant Investor Program is the fifth preference in the employment-based visa category, which gave rise to the nickname "EB-5." *See* 8 U.S.C. § 1153(b)(5)(A).

lowers the required capital investment amount to $500,000. *Id.* § 1153(b)(5)(C)(i), (ii).

Multiple foreign investors may pool their money in the same enterprise, provided that each invests the required amount and "each individual investment results in the creation of at least ten full-time positions." 8 C.F.R. § 204.6(g). Pooled investments are made through "regional centers," which are regulated by the U.S. Citizenship and Immigration Services ("USCIS"). The regional centers offer specific projects to investors and manage the pooled investments. *See id.* § 204.6(e), (m).

A foreign national investing in an enterprise must file an I-526 application with the USCIS to prove that the investment will satisfy EB-5 program requirements. *Id.* § 204.6(a), (j)(2). Approval results in conditional permanent resident status. Two years later, the investor may remove the conditions on lawful permanent resident status by filing an I-829 petition, demonstrating that the investment satisfied the EB-5 requirements and created, or will create within a reasonable period, ten qualifying jobs. *Id.* § 216.6.

## B. Factual Background

Feng and the SEC largely agree on the facts. To the extent that they have differing views of the record, we draw all justifiable inferences in the light most favorable to Feng. *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007).

Feng conducts an immigration law practice in New York City. Between 2010 and 2016, he led approximately 150 clients through the EB-5 process, substantially all of whom were Chinese nationals who did not speak English. Feng estimated that 80 percent of his clients found him

through his website, which posted comparisons and recommendations of available EB-5 projects. Feng holds a law degree from Columbia University and an MBA from the Tuck School of Business at Dartmouth, and he touted his skill at investigating and determining the most reliable investment opportunities.

Feng charged his clients a $10,000 to $15,000 upfront fee. His services included serving as a liaison between clients and regional centers, explaining the English-language offering materials to his clients, negotiating with regional centers regarding administrative fees charged to the clients by the centers, and compiling and submitting his clients' signed offering documents to regional centers. On three occasions, investors wired funds directly to Feng, who transferred the funds to the regional centers.

Feng also entered into marketing agreements with regional centers. Through these agreements, he reserved a number of the limited investor "spots" in certain EB-5 projects, which he then promoted on his website and tried to fill within a set time period. If one of Feng's clients made the required capital contribution to one of these regional centers, and if the USCIS approved the investor's I-526 petition, the regional center agreed to pay Feng commissions of $15,000 to $70,000. Although hundreds of regional centers participate in the EB-5 program, Feng procured investors only for ten centers, all of which agreed to pay commissions. Feng did not disclose to his clients the commissions he received from the regional centers unless they specifically asked about them.[3]

---

[3] When the SEC's investigation was pending, Feng revised his retainer agreement to state that regional centers may pay fees to an

Payment of a commission is an EB-5 industry practice, but many regional centers refuse to pay a commission to a U.S.-based attorney who is not registered as a broker, to avoid causing or aiding and abetting a violation of the broker registration requirement in Section 15(a) of the Securities Exchange Act of 1934. *See* 15 U.S.C. § 78o(a). Several regional centers offer a discount or rebate of a portion of the administrative fee charged to the investor if there is no referral commission for the attorney. Feng chose neither to register as a broker, nor to forego commissions.

When told by some regional centers that they could only pay commissions to overseas recruiters, Feng responded that he had referral partners in China who were finding investors. He entered into marketing agreements in which he promised to relay the commissions to those individuals. He also arranged agreements that were directly between the regional centers and the individuals. The referral partners included Feng's wife, mother, and mother-in-law. Feng described these individuals in his deposition testimony as his "nominees," whose role was to be "just a surrogate to receive the money." They did not do the work of recruiting investors—Feng did that himself. After the regional centers paid commissions to the individuals, they transferred the funds to Feng. Feng asserts that the regional centers only asked for a foreign contact to pay and did not "care" who it was.

In 2014, Feng also created Atlantic Business Consulting Limited ("ABCL"), based in Hong Kong. According to Feng, this decision was "driven in part by regional centers informing me they needed an overseas entity to pay." ABCL

overseas company owned by Feng upon completion of the client's visa approval.

entered into marketing agreements with regional centers, and its only source of revenue was EB-5 commissions. Feng did not inform the regional centers that he solicited and referred ABCL's investors himself. All of Feng's employees worked both for his law office and for ABCL. Feng's mother, Xiuyuan Tan, signed agreements between ABCL and regional centers as ABCL's "President," but Feng admitted she played no role in ABCL. Feng also did not inform the regional centers that he was ABCL's beneficial owner, with sole control of ABCL's bank account. Representatives from the regional centers testified that they would have ceased their marketing agreements if they had known about Feng's relationship with the individual referral agents and with ABCL.

In total, regional centers paid Feng and his overseas entities $1.268 million in commissions for investments made by Feng's clients. At the time of the district court judgment, these entities were contractually entitled to an additional $3.45 million in commissions, pending the approval of his clients' I-526 petitions.

The basis of the agreements between the regional centers and Feng's investors was set forth in the regional centers' offering materials, also known as private placement memoranda ("PPMs"). Many of the PPMs referred to the investments as "securities" and asserted that the investments were compliant with U.S. securities laws. The regional centers structured the investments as limited partnerships, in which the investors became limited partners and the regional center was the general partner. The regional centers promised investors a fixed, annual return on investment, which ranged across projects from 0.5 to 5 percent of the capital contribution, and investors received Schedule K-1 tax forms to report their investment income from the

partnership.  The partnerships all made construction loans or otherwise financed a specified construction project.  At the end of the investment term, typically five to six years, the regional centers promised the investors a return of their capital contribution, subject to market risks.

The PPMs required that investors pay an administrative fee, which ranged across projects from $30,000 to $50,000, in addition to the capital contribution of $1 million or $500,000.    The  PPMs  expressly  stated  that  these administrative fees were for operating and marketing costs, were not part of the capital contribution, and did not earn interest.

Approximately 20 percent of Feng's clients asked him to seek a reduced administrative fee from the regional centers. In those instances, Feng negotiated with regional centers and facilitated contracts between those regional centers and his clients for a rebate of a portion of the administrative fee. Feng did not disclose to these clients, however, that the administrative fees helped to fund his commissions, nor that the regional centers offset the clients' administrative fee rebate with a reduction in the commissions to which he was contractually entitled.    Indeed, Feng asked the regional centers not to inform the clients about either fact.  Feng explained in his deposition that he wanted to create the appearance to his clients that he was advocating on their behalf with the regional center and also to "keep as much of the marketing fee as possible"—that is, his commission— and to avoid further "haggl[ing]" with clients who might ask Feng to rebate more of the commission.[4]

---

[4] For example, one client testified that Feng sent him a check for $15,000, which Feng explained as a return of charges from the regional

## C. Procedural Background

The SEC filed a civil complaint against Feng and his law firm on December 7, 2015. The first and second causes of action allege fraud under Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("the Exchange Act"), respectively. The third cause of action alleges failure to register as a broker-dealer under Section 15(a) of the Exchange Act, 15 U.S.C. § 78o.

The defendants filed a motion for judgment on the pleadings, which the district court denied in August 2016. The parties subsequently filed cross-motions for summary judgment. Feng argued that the EB-5 investments were not "securities" because the investors had no expectation of profit—only of obtaining a green card. The SEC argued that the undisputed evidence showed that Feng acted as a "broker" of "securities" as a matter of law. The district court found no genuine dispute of material fact and granted summary judgment for the SEC on all three causes of action. In this appeal, Feng argues that the transactions were not "securities," and so the district court erred by denying his motion for summary judgment and granting the SEC's motion.

We review the district court's decision on cross-motions for summary judgment de novo. *Avery v. First Resolution Mgmt. Corp.*, 568 F.3d 1018, 1021 (9th Cir. 2009). Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We

---

center without disclosing that Feng had received a $70,000 commission on the client's $1 million investment.

consider cross-motions "separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *Zabriskie v. Fed. Nat'l Mortg. Ass'n*, 912 F.3d 1192, 1196 (9th Cir. 2019) (quoting *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006)).

## II.

Feng contends that the district court erred in its threshold determination that the EB-5 investments at issue were "securities." Because this finding is essential to all the causes of action, we begin by considering whether the district court properly made that determination as a matter of law.

The district court found that the EB-5 investments were securities because they were made through investment contracts between the regional centers and the investors. Section 3(a)(10) of the Securities Act defines the term "security" broadly, enumerating a long list of financial instruments, including "any . . . investment contract." 15 U.S.C. § 78c(a)(10). Although the Securities Act does not define the term "investment contract," the parties agree that the applicable test, set forth in *SEC v. W. J. Howey Co.*, requires "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. 293, 298–99 (1946). Courts applying *Howey* "conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect,'" including an analysis of the promotional materials associated with the transaction. *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) (quoting *Howey*, 328 U.S. at 298–99).

It is undisputed that Feng's clients invested money in a common enterprise managed by a third party. Feng argues that the transactions nonetheless were not "securities" because the clients did not expect profits from their investments. He asserts that his clients would have recognized that the modest fixed return they were due from the regional centers would not exceed the significant administrative fees that they paid. He further maintains that the lack of expected profit was not a concern for his clients because their motivation for making an EB-5 investment was to obtain U.S. visas. We find Feng's characterization of the EB-5 investments unpersuasive.

## A. The PPMs

The regional centers promoted and described the EB-5 investments in the PPMs. The PPMs repeatedly referred to the investments as "securities" and explained that the offerings were made pursuant to U.S. securities laws. Although "the name given to an instrument is not dispositive," "most instruments bearing th[e] traditional titles [associated with securities] are likely to be covered by the statutes." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 850 (1975). Further, "the use of a traditional name such as 'stocks' or 'bonds' [may] lead a purchaser justifiably to assume that the federal securities laws apply." *Id.* That inference inevitably would be drawn "when the underlying transaction embodies some of the significant characteristics typically associated with the named instrument." *Id.* at 851.

Such characteristics are evident and undisputed here. The EB-5 transactions were structured as investments in limited partnerships, with the promise of a fixed annual return on the investment, ranging from .5 to 5 percent. Investments in limited partnerships generally constitute investment contracts, *see SEC v. Murphy*, 626 F.2d 633, 640

(9th Cir. 1980), and a return based on a fixed rate falls within the broad definition of "profits," *SEC v. Edwards*, 540 U.S. 389, 394 (2004); *see also id.* at 396 ("[T]he commonsense understanding of 'profits' in the *Howey* test [is] simply 'financial returns on . . . investments.'" (quoting *Forman*, 421 U.S. at 853)); *Warfield*, 569 F.3d at 1022 (holding that the investors had an expectation of profit where the promotional materials emphasized "long-term income production potential"). The Supreme Court has reasoned that the promise of a fixed rate of return should be viewed as triggering an expectation of profits because the securities laws are intended "to regulate all of the 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *Edwards*, 540 U.S. at 396 (quoting *Howey*, 328 U.S. at 299). The Court was wary that "unscrupulous marketers of investments" might otherwise "evade the securities laws by picking a rate of return to promise." *Id.* at 394–95.

The PPMs' identification of the investments as securities, the form of the investment entity as a limited partnership, and the promise of a fixed rate of return all indicate that the EB-5 transactions were securities.

## B. The Administrative Fees

Feng insists, however, that the promised return is effectively nullified by the administrative fees. When an investor's administrative fee and capital contribution are considered together, Feng contends, the investor could not have expected to make any profit. The record, however, does not support treating the administrative fee as part of the investment. The PPMs expressly distinguish those two categories of funds, describing the investment as the "capital contribution," which would be "put at risk," or utilized by, the regional center. By contrast, the PPMs explain that the

administrative fee would be used to defray marketing and operating expenses.

Importantly, the separation between the capital contribution and the administrative fee is necessary to satisfy the EB-5 regulatory requirements. The USCIS requires that a qualifying EB-5 investment place capital "at risk for the purpose of generating a return on the capital placed at risk." 8 C.F.R. § 204.6(j)(2). In other words, to be eligible for the EB-5 program, the offering's terms must include a possible return on the capital contribution. Hence, even if Feng is correct that, as a mathematical proposition, combining the capital contribution and administrative fee would eliminate a return on the investment, the PPMs make clear that the two categories of funds are to be viewed separately.

Feng himself confirmed these separate identities when the USCIS questioned whether one of his clients met the EB-5 requirements. In a letter to the USCIS, Feng stated that the client's capital contribution was separate from the administrative fee and was therefore put "at risk for the purpose of generating a return." The client, Feng asserted, "made an at-risk capital investment of $500,000 . . . . No portion of an investor's contribution has been or will be applied towards legal service fees or administrative fee[s], marketing costs or interest payment of [the regional center], which are paid from the *separate* $50,000 administrative fee."

Feng thus attempts to characterize the administrative fees in two different ways to suit his own purposes. On the one hand, he explained that the administrative fee should be excluded from the "investment" to establish that the investment satisfies the EB-5 requirement of a possible return. On the other hand, he seeks to include the administrative fee in the securities analysis to show there is

no possibility of generating the return as required by the *Howey* test. That inconsistent approach is plainly contrary to Congress's intent in enacting the securities laws, as it would empower "unscrupulous marketers of investments" to structure deals to evade the designation of a security. *Edwards*, 540 U.S. at 394. Feng's argument that the administrative fee upends the expectation of profits has no merit.

## C. Motivation

We likewise find unsupportable Feng's assertion that—whatever the form of the investment and the rate of return—his clients nonetheless lacked an expectation of profit because they were motivated to participate in the EB-5 program by the promise of visas, not by profit. *See Warfield*, 569 F.3d at 1021 (holding that the focus of *Howey* is the "objective inquiry" into "what the purchasers were offered or promised," although the investors' subjective intent "may have some bearing on the issue of whether they entered into investment contracts"). We do not doubt that the investors' primary reason to participate in the EB-5 program was to gain U.S. visas. But Feng oversimplifies his clients' motivations.

An EB-5 investor's interest in a visa is inextricably tied to the financial success of the regional center's project. The EB-5 program by design links the success of the investment to the investor's success in obtaining a visa. An EB-5 applicant must prove to the USCIS that an investment in fact led to the creation of at least ten full-time jobs. 8 U.S.C. § 1153(b)(5)(A); 8 C.F.R. §§ 204.6, 216.6. Understanding the importance of a *successful* investment, Feng marketed his ability to evaluate the multitude of regional centers and recommend projects that were most likely to be sustained long enough to create the requisite jobs to qualify the

investor for the EB-5 visa.  The record also contains testimony from some of Feng's client-investors who said that the likelihood of the regional center returning their capital contribution was important to them or that they sought EB-5 projects with higher rates of return.  Feng's argument thus relies on a false dichotomy between the visa and the success of the investment.[5]

We therefore agree with the district court that the investments in this case constitute securities in the form of investment contracts.

## III.

Having resolved the threshold securities issue, we next consider Feng's challenges to the grant of summary judgment for the SEC on each of the three causes of action brought against him.

## A.  Failure to Register as a Broker

Section 15(a)(1) of the Exchange Act makes it unlawful for a "broker . . . to induce or attempt to induce the purchase or sale of[] any security" without registering with the SEC. 15 U.S.C. § 78o(a)(1).  The statute defines "broker" as "any

---

[5] In a recent memorandum disposition, we rejected the argument that EB-5 investments do not constitute securities where the investors' interest was to obtain visas rather than profits.  *SEC v. Liu*, 754 F. App'x 505, 507 (9th Cir. 2018).  The facts in *Liu* mirror those in this case, with a series of $500,000 EB-5 investments and accompanying $45,000 administrative fees.  *Id.*  The court held that the promise of an annual return of only 0.25 percent was enough to establish an expectation of profit, "[e]ven if it was not [the investors'] primary motivation."  *Id.*

person engaged in the business of effecting transactions in securities for the account of others."  *Id.* § 78c(a)(4)(A).

The district court concluded that the uncontroverted evidence establishes that Feng was acting as a broker and violated the registration requirement.  We agree.

### 1.  The Broker Determination

In making its broker determination, the district court utilized the totality-of-the-circumstances approach that other courts have used under Section 15(a)(1), relying on a set of factors first set forth in *SEC v. Hansen*, No. 83 Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984).  *See SEC v. Collyard*, 861 F.3d 760, 766 (8th Cir. 2017); *SEC v. George*, 426 F.3d 786, 797 (6th Cir. 2005); *see also SEC v. Imperiali, Inc.*, 594 F. App'x 957, 961 (11th Cir. 2014) (per curiam) (quoting *George*, 426 F.3d at 797).  Courts emphasize that the so-called *Hansen* factors are "nonexclusive."  *Collyard*, 861 F.3d at 766.

In performing its inquiry, the district court considered whether Feng:

> (1) is an employee of the issuer of the security;
>
> (2) received transaction-based income such as commissions rather than a salary;
>
> (3) sells or sold securities from other issuers;
>
> (4) was involved in negotiations between issuers and investors;
>
> (5) advertis[ed] for clients;

(6) gave advice or made valuations regarding the investment;

(7) was an active finder of investors; and

(8) regularly participates in securities transactions.

*SEC v. Feng*, No. 15-09420, 2017 WL 6551107, at \*7–8 (C.D. Cal. Aug. 10, 2017) (footnote omitted).[6] The district court found that, although Feng was not an employee of the issuer, his conduct satisfied all the other factors. *Id.* at \*8. He received commissions from regional centers, sought investors and clients through his website and other online forums, negotiated with regional centers about the terms of the projects, and gave advice about EB-5 projects' likelihood of success.

Although Feng does not contest the facts underlying these conclusions, he objects to the factor-based analysis generally, arguing that the factors are so vague that they erroneously encompass individuals who are merely providing legal advice in the EB-5 context.[7] To the contrary,

---

[6] The district court's eight factors essentially tracked the considerations identified in *Hansen*. *Feng*, 2017 WL 6551107, at \*7–8; *Hansen*, 1984 WL 2413, at \*10.

[7] Feng also argues that the district court's factors omit the requirement that a broker must have authority or control over the accounts of others. But the caselaw cited by Feng does not impose such a requirement as a prerequisite for finding that someone is a broker. *See SEC v. Kramer*, 778 F. Supp. 2d 1320, 1339–40 (M.D. Fla. 2011) (discussing authority over an account as one of several factors); *SEC v. M & A West, Inc.*, No. C-01-3376 VRW, 2005 WL 1514101, at \*9 (N.D. Cal. June 20, 2005) (same); *cf. SEC v. Mapp*, 240 F. Supp. 3d 569, 592

the application of the *Hansen* factors reveals that much of the work Feng performed for his clients, rather than being traditional legal work, aligns with the indicia of broker activity identified by those factors.

For example, Feng asserts that the factor "received transaction-based income such as commissions rather than a salary" is unclear and could improperly include an attorney's contingent fee.  However, Feng charged his clients a *non*contingent, upfront fee.  And it is undisputed that Feng and his nominees received $1.268 million in commissions from the regional centers—not his legal clients—for recruiting investors to the regional centers' EB-5 projects. On these facts, the "commissions" factor does not threaten to mislabel traditional legal services as broker activity.

Similarly, Feng suggests that "involve[ment] in negotiations between issuers and investors" should not include his legal work explaining to clients aspects of legal compliance and regional center communications.  Feng ignores, however, the evidence that he communicated extensively with the regional centers, posing numerous questions about the terms of the projects and negotiating the amount of the administrative fees.

In addition, Feng contends that the factor "gave advice or made valuations regarding the investment" should not include legal advice about the merits of the various EB-5 projects.  He claims that he was advising his clients about how to obtain legal permanent residency status, not about

---

(E.D. Tex. 2017) (discussing but not deciding whether control over the account of others is an element or a nondispositive factor).  Further, assuming that control is a pertinent factor, it is present here in the multiple instances in which client funds passed through Feng's accounts.

how to make money. The record, however, indicates that Feng's services included investment advice. He reviewed and promoted certain EB-5 projects based on their likelihood of success under the EB-5 requirements, with particular attention to the projects' likely ability to create the requisite number of jobs over time to qualify the investor for an EB-5 visa, as well as the likelihood the projects could return the investors' capital contributions. This work goes beyond the traditional work of a lawyer.

Finally, Feng suggests that the factor "active finder of investors" improperly conflates seeking legal clients with seeking investors. This argument, too, is meritless. Feng sought a particular kind of client—one who would become an investor with a regional center with which he had a marketing agreement and a reserved investor slot. Feng's 150 clients invested more than $65 million. In this EB-5 context, his legal clients and the regional center investors were, in fact, one and the same.

## 2. Feng's Additional Arguments

Feng goes beyond the *Hansen* analysis to argue more generally that the broker registration requirement should not apply to his circumstances. First, he asserts that the requirement should apply only to individuals who trade securities on an exchange and not to those involved in transactions between private parties—deals commonly referred to as "over-the-counter." It is well established, however, that "[t]he 1934 [Exchange] Act was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges *and in over-the-counter markets*." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) (emphasis added) (citing S. Rep. No. 792, at 1–5 (1934)). Although the Exchange Act exempts brokers "whose business is

exclusively intrastate and who do[] not make use of any facility of a national securities exchange," Feng's business was not "exclusively intrastate." *See* 15 U.S.C. § 78o(a)(1).

Second, Feng argues that the broker registration requirement is unnecessary in his circumstances because registered-broker duties duplicate the fiduciary duties that apply to the attorney-client relationship. Feng analogizes to the registration exemption for lawyers under the Investment Advisers Act of 1940, which excludes from the definition of an investment adviser "any lawyer, accountant, engineer, or teacher whose performance of such services is solely incidental to the practice of his profession." 15 U.S.C. § 80b-2(a)(11)(B). Feng asserts—without citation—that the Investment Advisers Act exempts attorneys because of their heightened fiduciary duty to clients, and he urges us to apply "this rationale" to create an attorney exception to the broker registration requirement in the Exchange Act.

This argument fails for multiple reasons. As we have already explained, even if such an exemption existed, the record belies any claim that Feng's activities were "solely incidental to the practice of [law]." Moreover, if an attorney's fiduciary duty were the rationale for the exemption under the Investment Advisers Act, the incidental nature of the investment-related work would seem irrelevant because the fiduciary duty presumably would cover any work on behalf of clients. Feng essentially asks us to perform a legislative act by adding an exemption to one statute on the basis of a different statute for which Congress expressly provided an exemption. Self-evidently, we cannot do that.

In a last-ditch attempt to justify his failure to register, Feng argues that imposing the broker registration requirement on U.S.-based attorneys would "force" them

"not to help these people." This argument poses a false choice. Attorneys who provide only legal advice to clients about the EB-5 program are not required to register. Attorneys who act as brokers in the EB-5 context may legally do so only if they register with the SEC.

### 3. Conclusion

Given the undisputed facts in the record, we agree with the district court that Feng, as a matter of law, was "engaged in the business of effecting transactions in securities for the account of others" and thus was required to register with the SEC as a broker. 15 U.S.C. §§ 78c(4)(A), 78o(a)(1).[8]

## B. The Fraud Determinations

Feng argues that the district court erroneously found that he committed securities fraud in violation of Section 17 of the Securities Act and Section 10(b) of the Exchange Act, as implemented through Rule 10b-5. The district court's determinations were based on two theories of fraud liability: material omissions and schemes to defraud. We review each in turn.

---

[8] Feng also appeals the denial of his motion for judgment on the pleadings, arguing that the terms "security" and "broker" in Section 15(a) of the Exchange Act are unconstitutionally vague. A word is not vague when it has a "settled legal meaning." *United States v. Williams*, 553 U.S. 285, 306 (2008). Section 15(a) was enacted 80 years ago, and it has been applied countless times by the courts. There was no error in the district court's denial of the motion for judgment on the pleadings.

### 1. Material Omissions (Section 17(a)(2) and Rule 10b-5(b))

The antifraud provisions of the Securities Act, Section 17(a)(2), and the Exchange Act, Section 10(b), developed through Rule 10b-5(b), "forbid making a material misstatement or omission in connection with the offer or sale of a security by means of interstate commerce." *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001). Under these provisions, it is unlawful for any person, in the offer or sale of securities, "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2). The text of Rule 10b-5 largely mirrors the text of Section 17(a).[9] Although there are differences in the state of mind requirements for Rule 10b-5(b) and Section 17(a)(2), a showing of intentional or knowing conduct satisfies both. *See Aaron v. SEC*, 446 U.S. 680, 695–97 (1980) (holding that scienter is an element of Section 10(b), Rule 10b-5, and Section 17(a)(1), but not Section 17(a)(2) or (3)).

A fiduciary duty to disclose certain information renders an omission of that information misleading. *See United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010). In *Laurienti*, the court addressed a broker's liability under Rule 10b-5(b) for failure to disclose commissions to his clients. The court noted that, while the broker/client relationship

---

[9] Section 17(a) of the Securities Act prohibits fraud in the sale of securities. Rule 10b-5, adopted by the SEC pursuant to its authority under Section 10(b) of the Exchange Act, incorporates the operative language of Section 17(a) explicitly and also extends the prohibition to fraud committed in the purchase of securities. *See Ernst & Ernst*, 425 U.S. at 212 n.32.

does not itself impose a fiduciary duty, circumstances may create "a relationship of trust and confidence." *Id.* at 540. Often, a broker has a fiduciary duty when he has discretionary authority over a client's account, "but we have recognized that particular factual circumstances may serve to create a fiduciary duty between a broker and his customer even in the absence of a discretionary account." *Id.* (quoting *United States v. Skelly*, 442 F.3d 94, 98 (2d Cir. 2006)). The court held that, however the duty arises, "if a broker and a client have a trust relationship, . . . then the broker has an obligation to disclose all facts material to that relationship." *Id.* at 541.

Here, as we have determined, Feng worked as both a broker and an immigration attorney. Indeed, Feng emphasizes his role as an attorney and acknowledges that, as such, he had fiduciary duties to his clients. Those duties included the obligation to disclose conflicts of interest. *See* N.Y. Rules of Prof'l Conduct (22 NYCRR § 1200.0) 1.4 (duty to communicate any information needed by the client to give informed consent), 1.7 (duty to disclose a conflict), 1.8 (duty to disclose business relationships).

Feng's argument that there is no conflict because his clients were not harmed applies the wrong standard. The conflict of interest rule addresses the *risk* of harm to clients, asking whether a "reasonable lawyer would conclude . . . there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests." N.Y. Rules of Prof'l Conduct 1.7(a). In these transactions, there was a risk that Feng's judgment would be swayed by the promise of commissions—that, for example, he would prefer a regional center that paid a higher commission but had a slightly lower likelihood of success

over a regional center that offered a lower commission but had a better opportunity for the client.

Indeed, when Feng was asked in his deposition whether the commission from the regional center and his representation of a client presented a conflict, he acknowledged that it did:

> Yes. I see it as sort of like a conflict because we're in between, between regional center and the client. I'm aware of getting legal fees from the client, but also, even though we are not issuer's counsel, we are definitely not regional center's counsel. But regional centers pay us after the 526 getting approved. Even though we realize there's such a conflict, but our interest is first and foremost with the clients.

His assertion that he shared his clients' goal of obtaining a green card does not eliminate the risk of the commission's influence on his professional judgment. Further, the rules provide that only the client, fully informed of both the conflict and the risks stemming from the conflict, may make a judgment about whether to accept representation notwithstanding the conflict. N.Y. Rules of Prof'l Conduct 1.4, 1.7.

"[E]ven in a trust relationship," the duty is "to disclose only *material* facts." *See Laurienti*, 611 F.3d at 541. Generally, an omission is material "if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32

(1988)). Here, the record includes statements of individual investors who said that if they had known about Feng's commissions, they would have attempted to negotiate their administrative fees. Feng also testified that he concealed his commissions to avoid anticipated client requests for rebates. He said that he thought disclosure of his commissions would encourage the clients to ask for more reductions in their administrative fees, and he did not want to open the door to negotiations that would lower his clients' costs but decrease his payout. We thus agree with the district court that Feng's failure to disclose his conflict of interest was material. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (holding that materiality may be resolved at summary judgment "if the established omissions are so obviously important to an investor[] that reasonable minds cannot differ on the question of materiality" (internal quotation marks omitted)).

Finally, Feng's testimony establishes intent to deceive. Feng stated that he did not want to tell clients about his commissions from the regional centers because it would be costly. Feng's brief similarly describes his choice not to disclose as a "business decision."

### 2. Schemes to Defraud (Section 17(a)(1) and (3) and Rule 10b-5(a) and (c))

The securities fraud provisions also prohibit any person, in the offer or sale of securities, "to employ any device, scheme, or artifice to defraud" or "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1), (3); *see also* 17 C.F.R. § 240.10b-5(a), (c). The state of mind requirement varies among these provisions, but a showing of intentional or knowing conduct clears all thresholds. *See Aaron*, 446 U.S. at 695–97.

The district court found that Feng defrauded the regional centers that refused to pay commissions to U.S.-based attorneys not registered as brokers. Feng evaded this restriction by informing the regional centers that he was affiliated with foreign referral agents and companies, holding himself out to the regional centers as a middleman. Feng furthered this scheme by setting up ABCL in China to receive commission payments, while maintaining control of both ABCL's bank account and operations. Feng performed the recruitment services himself and received the commissions that regional centers believed they were paying to the affiliated recruiters. Feng recruited his mother to sign documents as ABCL's president, even though she had no actual role in the company. Representatives from the regional centers testified they would have ceased this arrangement if they knew Feng's relationship with either the agents or ABCL.

The district court also found that Feng engaged in a scheme to defraud clients who sought a reduction in their administrative fees. Generally, as noted, regional centers were willing to rebate a portion of the administrative fee that they charged investors if the regional center could also reduce the commission it paid for the recruitment of that investor. When a client asked Feng to negotiate with the regional center to reduce his administrative fee, Feng arranged with the regional center to lower the administrative fee by reducing the commission. He took measures to conceal this arrangement from his clients, however, because he wanted to "keep as much of the marketing fee as possible" and avoid further negotiation with clients, while also creating the appearance to his clients that he was prevailing on their behalf with the regional centers. Feng asked the regional centers to rebate a portion of the administrative fee

but not to disclose that the funds were reallocated from a commission.

Feng challenges on two grounds the district court's finding that his conduct violated the Securities and Exchange Acts. First, Feng asserts that the scheme-to-defraud allegations under Rule 10b-5(a) and (c) improperly duplicate the Rule 10b-5(b) material omission claim. We see no duplication. The district court addressed the fraud against the regional centers only as a scheme to defraud, not as a material omission. With regard to the fraud against the clients, the district court focused on Feng's failure to disclose his conflict of interest to his clients as material omissions and, separately, on his efforts to conceal the source of the rebates as a scheme to defraud.

Second, Feng argues that his establishment of overseas entities and occasional arrangement of rebates for clients were not unlawful. But, deceptive conduct that is not "inherently unlawful" may form the basis of a scheme to defraud. *SEC v. Wey*, 246 F. Supp. 3d 894, 918 (S.D.N.Y. 2017). In addition, Feng's attempt to analogize the rebate scheme to a store proprietor giving a customer a discount is inapt. The fraudulent conduct was his scheme to make the rebate appear to come from his advocacy on behalf of the client, while concealing the relationship between the reduction and his undisclosed commission.

We accordingly affirm the district court's finding that Feng engaged in securities fraud in violation of Section 17(a) and Section 10(b).

## IV.

Finally, Feng challenges the district court's disgorgement order. The district court calculated that Feng

received $1.268 million for commissions in connection with the EB-5 program and ordered disgorgement of the entire amount.  Feng contests the disgorgement of fees paid to his overseas entities, suggesting that some of the fees were used to cover expenses.  He does not dispute that he controlled those overseas entities.

We review the court's imposition of disgorgement for abuse of discretion.  *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006).  A disgorgement calculation "should include 'all gains flowing from the illegal activities,'" *id.* at 1114 (quoting *SEC v. Cross Fin. Servs.*, 908 F. Supp. 718, 734 (C.D. Cal. 1995), and "requires only a 'reasonable approximation of profits causally connected to the violation,'" *id.* at 1113–14 (quoting *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1192 n. 6 (9th Cir. 1998)).

Feng used his overseas entities—ABCL and his other nominees—to advance his scheme to defraud the regional centers.  The money paid by regional centers to Feng's overseas entities is therefore exactly the focus of the fraud against the regional centers, such that the district court could find a "causal[] connect[ion]" through which the funds "flow[] from the illegal activities." *Id.* at 1114.  Feng should not have been collecting these commissions in the first place, and it would be unjust to permit him to retain some of the ill-gotten funds to cover his expenses. *See id.* ("[I]t would be unjust to permit the defendants to offset against the investor dollars they received the expenses of running the very business they created to defraud those investors into giving the defendants the money in the first place.").  We accordingly find no abuse of discretion in the disgorgement order.

**AFFIRMED.**